This case involves claims of breach of contract and fraudulent misrepresentation arising out of the termination of the plaintiff's employment. The trial court granted summary judgment for the defendants on all counts, and we affirm.
The plaintiff was employed by American Industries in Conway, Arkansas, in 1982. In that year, he was interviewed by Anthony (Tony) Lestingi, acting president of Quartrol Corporation, for a position as manufacturing engineering manager at *Page 1295 
Quartrol's Birmingham plant. Selby accepted Lestingi's offer of employment and moved his family to Alabama. Approximately 14 months later, Selby's employment was terminated by Richard Hacherl, who had become president of Quartrol in January of 1983.
At the time Quartrol hired Selby, it memoralized the parties' agreement in two written documents provided by Larry Smith, Quartrol's personnel manager. See appendices A and B.
 I
We first examine Selby's claim that the parties entered into an employment contract of fixed duration. Selby contends that he was guaranteed a minimum of three years' employment. His claim is based upon his deposition testimony regarding an interview he had with Tony Lestingi, Quartrol's agent:
 "Q Was there anything else specific agreed to other than what is on the memo that Larry Smith signed on April 26th 1982?
 "A There was a long discussion between myself and Tony as to the fact of, you know, how long do you — you change jobs some, you know, are you here to settle down. I told him that I wanted a place to call home. I wasn't looking for a place to come and stay a year or two years. My wife was willing to give up a teaching position. And I had some children that had — one child that was having some problems in school. And I was looking for long-term residency and not a short term position.
 "Q You didn't agree with Tony Lestingi, though, that you would work for Quartrol for any particular length of time, like six months, two years, five years, or any particular period, did you?
 "A I guaranteed Tony I would stay a minimum of three years until my son graduated from high school.
 "Q Was there any agreement between you and Quartrol or you and Tony Lestingi that said you would work for any particular period of time and that Quartrol would employ you for that particular period of time?
 "A Tony asked me how long I would stay at Quartrol. And I said, Tony, I guarantee I am going to stay here as long as my son is in high school. He said that is what I am looking for. I am looking for a long-term employee."
Alabama law is clear that, absent a clear and unequivocal offer of employment for a specified duration, an employment is at-will, Bates v. Jim Walter Resources, Inc.,418 So.2d 903 (Ala. 1982), Hinrichs v. TranquilaireHosp., 352 So.2d 1130 (Ala. 1977).
Of course, summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Rule 56(c), Ala.R.Civ.P. All reasonable doubts concerning the existence of a material fact must be resolved against the moving party.Lolley v. Howell, 504 So.2d 253 (Ala. 1987). If there is a scintilla of evidence supporting the position of the nonmoving party, summary judgment is not appropriate.Fountain v. Phillips, 404 So.2d 614 (Ala. 1981). Was there presented a scintilla of evidence that Selby had anything other than an employment terminable at the will of Quartrol? We think not.
Neither the printed contract (Appendix B), which Selby signed, nor the April 26 itemization of the parties' agreement (Appendix A) contains any language supporting Selby's claim of a three-year contract. Selby conceded, in deposition testimony, that the written documents fairly outlined the terms of the parties' agreement; nonetheless, he maintains that the parties entered into an employment contract of three years' duration. When asked what agreement, if any, existed between the parties that was not expressed in the written documents, Selby testified, in addition to the testimony set out above, that "it was more or less an agreement between me and Tony that, you know, if I came over here, he was wanting me to commit to him and he was committing to me that we were going to stay a minimum of three years and hopefully a whole lot longer than that." *Page 1296 
Assuming, as we must for purposes of reviewing the summary judgment, that the conversation testified to by Selby actually took place, it cannot form the basis for a breach of contract claim, for at least three reasons. First, it was not sufficiently certain to create a binding contract for three years. Second, his testimony of an oral agreement violates the parol evidence rule, and is inadmissible. Third, an oral three-year employment contract would violate the Statute of Frauds. Code 1975, § 8-9-2(1), provides:
 "§ 8-9-2. Certain agreements void unless in writing.
 "In the following cases, every agreement is void unless such agreement or some note or memorandum thereof expressing the consideration is in writing and subscribed by the party to be charged therewith or some other person by him thereunto lawfully authorized in writing:
 "(1) Every agreement which, by its terms, is not to be performed within one year from the making thereof. . . ."
Under the facts and circumstances evident here, the evidence also shows no meeting of the minds of the parties on the duration of the employment. Cf. Bates v. Jim WalterResources, Inc., supra.
 II
We now examine Selby's claim that summary judgment was inappropriate on his fraud claims. Selby makes two separate arguments. First, as stated above, he argues that Lestingi misrepresented to him that his employment would be for a definite duration. Second, he argues that Quartrol, through its agents, and particularly through Hacherl, misrepresented that his job was secure and that there was no reason why he should not build a new home in Birmingham. Specifically, he claims that he was awarded a $1,000 bonus for good performance in April of 1983 and that Hacherl in that month said, "I don't know why you wouldn't want to build a new home," and that Larry Smith, on inquiry by Selby's mortgage company, stated that Selby's prospects for continued employment were "excellent." As a result of these alleged misrepresentations, according to Selby, he was misled into constructing an expensive home, which the agents of Quartrol knew he could afford only if he remained employed by the company. The record shows that, some five months after his termination, and without Selby's having made the first payment during that interim, the mortgage company foreclosed the mortgage on Selby's home.
Selby argues in his brief that the above-stated facts raise an issue of material fact sufficient to withstand a motion for summary judgment on his misrepresentation claims. Counsel for Quartrol, on the other hand, argues several grounds on which to sustain the judgment, including lack of falsity of the statements; lack of proof of a present intent
not to perform on the part of Quartrol when the statements were made; and lack of reliance, based on the principles of law set out in the case of Bowman v. McElrath PoultryCo., 468 So.2d 879 (Ala. 1985), in which a farmer brought an action against a poultry company for alleged false representations upon which he claimed he relied to his detriment in purchasing an expensive egg-gathering machine. The Court in Bowman stated the elements of a fraud claim:
 "The issue presented on appeal is whether there is evidence which reasonably affords an inference that the plaintiff was defrauded. The essential elements of a fraud claim, as required under the provisions of § 6-5-101, Code 1975, are: (1) misrepresentation of a material fact; (2) made willfully to deceive, or recklessly without knowledge; (3) acted upon by the opposite party; and (4) reliance by the complaining party which was justifiable under the circumstances.
 "Our careful review of the record reveals the trial court was correct in granting a directed verdict in favor of McElrath. The facts presented by the plaintiff simply do not support a cause of action for fraud. McElrath's agent did give Bowman a brochure on an automatic egg-gathering system, prepared by the manufacturer of such a system, which *Page 1297 
indicated automation would increase egg production by as much as 10%. However, Bowman himself negotiated the purchase and installation of the system; McElrath was not involved, except to have encouraged Bowman to purchase the system. Therefore, Bowman could not have justifiably relied on representations made by McElrath, if any, that indicated the automatic egg-gathering system would function properly and improve Bowman's production.
 "Furthermore, Bowman had a responsibility, at least after 1977, pursuant to his contracts with McElrath, to maintain his own records. Prior to that date, the responsibility of the maintenance of records was not set forth in the contract. It is clear, however, that Bowman was in a position to discover, more than a year before he filed suit, whether the automatic egg-gathering system had increased or decreased his production.
 "In short, we do not see any material evidence that suggests or reasonably implies that the defendant McElrath Poultry Company, through its agent, Croft, defrauded Bowman."
It is clear in the present case, from the record and from the briefs of the parties, that the alleged misrepresentations concerned future acts. In such cases, not only must the basic elements of fraudulent misrepresentation, Code 1975, § 6-5-101, be fulfilled, but the plaintiff must also prove two additional elements: (1) that the defendant intended, at the time of thealleged misrepresentation, not to perform, and (2) that the defendant made the representation with a presentintent to deceive. Clanton v. Bains Oil Co.,417 So.2d 149 (Ala. 1982). After a careful review of the record, this Court can find no evidence to support an allegation that,at the time the representations were made, the defendants lacked a present intent to perform, and intended to deceive Selby.
We are aware of this Court's case of Winn-DixieMontgomery, Inc. v. Henderson, 395 So.2d 475 (Ala. 1981). There, the plaintiff relied, to his detriment, on Winn-Dixie's promise of a transfer; evidence was produced in that case, however, that showed that Winn-Dixie lacked apresent intent to perform as promised. This case is factually different; therefore, summary judgment was properly granted on the fraud claims. Our judgment on this issue is based, in part, on the fact that there is no evidence that Selby knew, until after he was discharged, that Quartrol, through Smith, had notified the mortgage company that his prospect for future employment was "excellent," but even assuming that Selby knew that Quartrol had made this representation at that time, there is no evidence from which a trier of fact could infer, and therefore find, that Quartrol made this statement with an intent to deceive and with a present intent not to perform.
In light of the foregoing analysis, the judgment of the trial court is due to be, and it hereby is, affirmed.
AFFIRMED.
ALMON, BEATTY and HOUSTON, JJ., concur.
ADAMS, J., concurs in the result. *Page 1298 
 APPENDIX A
[EDITORS' NOTE: The logo IS ELECTRONICALLY NON-TRANSFERRABLE.]
 Quartrol Flow Control Quartrol Corporation
A Condec Company P.O. Box 11564 April 26, 1982 Birmingham, AL 35202 (205) 595-0510
TO: Whom It May Concern
FROM: Larry D. Smith
SUBJECT: Ricky L. Selby
 Based on conversations concerning an offer of employment, the following agreement has been reached between Ricky L. Selby and Quartrol Corporation pertaining to his employment:
a. Base Salary = $39,500 per year
b. Merit Review after a six-month period of employment
 c. Quartrol to pay packing and moving expenses to Alabama
d. Quartrol to provide living expenses until relocated
 e. Round-trip air fare to and from home every other weekend
 f. One trip for family to seek suitable housing in Birmingham
g. $2,000 "curtain money" at the time of relocation
h. Quartrol to pay closing costs on home in Arkansas
 Witnesses to this conversation were Ricky L. Selby, Anthony J. Lestingi, and the undersigned.
 Larry D. Smith Industrial Relations Manager *Page 1299 
 APPENDIX B AGREEMENT
IN CONSIDERATION of my employment by __________ and/or its affiliated companies successors and assigns (hereinafter called the Company), I agree that:
(1) I hereby assign and will promptly disclose and assign to the Company exclusively, all inventions, discoveries, improvements, devices, tools, machines, apparatus, appliances, designs, practices, processes, methods, formulae, products, trade secrets and the like (hereinafter collectively called "inventions"), whether or not patentable, directly or indirectly useful in or related to the Company's business, which I shall make, originate, conceive or reduce to practice, either solely or jointly with others, during the term of my employment by the Company; and I further agree that during and after the term of my employment without charge to the Company, but at its expense, to execute, acknowledge and deliver any and all papers necessary to the Company to obtain patents for its own benefit on said inventions in any and all countries; said patents, applications for patents and inventions to remain the property of the Company whether patented or not.
(2) I will not at any time disclose to anyone other than authorized officers or employees of the Company or make use of information or knowledge relating to the Company's business, manufacturing methods, processes, techniques, products or research obtained by me while in the employ of the Company which shall not be generally known to the public or recognized as standard practices, and on leaving the employ of the Company, will not take with me without its consent any drawing, blueprint or other reproduction, confidential data, parts, tools or equipment.
(3) I recognize, further, that all records, reports, notes, compilations, or other recorded matter, and copies or reproductions thereof, relating to the Company's operations, activities or business, made or received by me during any period of my employment with the Company are and shall be the property of the Company exclusively, and I will keep the same at all times subject to its control and will surrender the same at the termination of my employment, if not before.
(4) It is further understood that, should the Company decline or neglect for one year after an invention shall have been brought to its notice as aforesaid, to apply for a patent thereupon. I may apply for a patent in my own name and to my own use, provided, however, that I first notify the Company, in writing, of my intention to do so and that the Company further neglects to apply for such patent for ninety days after said notice.
(5) I attach hereto a complete list of all inventions which I have made or conceived prior to my employment by the Company and I desire that these inventions shall be excluded from this agreement.
IN WITNESS WHEREOF, I have hereunto set my hand and seal this
__________ day of __________ 19__
_______________ _______________ (L.S.) Witness Employee *Page 1300