GEOQUEST PRODUCTIONS, LTD., Plaintiff-Appellant, v. EMBASSY HOME ENTERTAINMENT, a/k/a Nelson Entertainment Incorporated, Defendant-Appellee.

First District (6th Division)   No. 1—91—1976

Opinion filed April 24, 1992.

---

Peter Flynn, P.C., and Peter C. Vilmos, both of Cherry & Flynn, of Chicago, for appellant.

Wildman, Harrold, Allen & Dixon, of Chicago (James R. Morrin and Jill A. Cuba, of counsel), for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Plaintiff, Geoquest Productions (Geoquest), filed this breach of contract action against defendant, Embassy Home Entertainment, Inc. (Embassy), a videocassette distributor. Prior to trial, the trial court granted defendant's *in limine* motion barring evidence of an alleged, prior oral promise guaranteeing minimum sales. On appeal, plaintiff contends that the trial court erred in granting defendant's motion.

In 1985, Geoquest produced a murder mystery videocassette program entitled "The Gold Key" which it planned to market as a prize game. Geoquest envisioned that it would sell the film in video stores and award a $100,000 prize to the first purchaser of the videocassette who solved the mystery. Geoquest budgeted $70,000 for advertising and promotion of the film. After Geoquest substantially completed the film and the promotion materials, it contacted Embassy about distribution. Negotiations between the parties took place over a three-day period in July 1985 at defendant's home office in Los Angeles. During this time, Richard Kutok, Geoquest's president, met with the following Embassy agents: Reg Childs, president; Rand Bleimeister,

vice-president of sales and marketing; Margaret Cleave, director of marketing; and Jess Wittenburg, senior vice-president and in-house attorney. The parties agreed that defendant would distribute the film and discussed the terms of the agreement. On July 26, 1985, Embassy forwarded to Geoquest a letter agreement for Embassy's distribution of the film. The letter began as follows:

> "We will in all likelihood submit a more formal contract later, but, in the meantime, I'd like to confirm our agreement regarding Embassy's video distribution of THE GOLD KEY on the following terms: ***."

Geoquest did not sign the July 26 letter agreement. Additional negotiations ensued, and on August 20, 1985, Embassy sent Geoquest a second letter which incorporated several changes. Under the "shortfall provision," if the revenues from the film did not meet Embassy's advertising expenditures, Geoquest would promptly pay Embassy the shortfall upon satisfactory proof of such expenditures. The document also revised the dates pertaining to the solicitation of orders and the start and end dates for the contest. This letter began as follows:

> "I've revised the draft of July 26 along the lines you, I and Rand have been discussing. This letter can now serve to confirm our agreement regarding Embassy's video distribution of THE GOLD KEY on the following terms: ***."

Geoquest did not sign this letter agreement. After more negotiations, Embassy submitted the third version of the parties' agreement to Geoquest, which Geoquest signed and returned on or about September 18, 1985. This version deleted the suggested retail price provision, established a minimum selling price for the film, limited Geoquest's obligation to provide errors and omissions insurance, and shifted the responsibility to arrange for manufacture of the film from Geoquest to Embassy. This letter agreement, like the two prior agreements, contained the following language above the signature lines:

> "If I've got the essential terms right, please indicate Geoquest's agreement by signing and returning the enclosed copy. *** Until such time, if ever, that we execute a more formal agreement, this letter will serve to reflect the *binding agreement* between the parties."

Pursuant to the letter agreement, on August 19 Embassy began to formally solicit orders from its distributors and to advertise and promote The Gold Key. By the December 23, 1985, cut-off date for sales, Embassy had sold only 5,700 copies of the film. After Embassy deducted from the sales revenues for returns, Geoquest received no sales revenues from Embassy.

Rand Bleimeister, Embassy's vice-president of sales and marketing, testified at his deposition that he told plaintiff that "if we get lucky," the film would sell between 75,000 and 100,000 copies, but that "if we get unlucky," it might only sell 20,000. Bleimeister stated that such statement did not amount to a guarantee. He stated, however, that it was not unusual for Embassy to guarantee "a certain amount of income to the licensor." Bleimeister testified that the August 20 letter contained the terms of the parties' agreement, although he admitted that it did not indicate: the accounting period for the film sales; the percentage of revenues to be held as a reserve against returns; the ability of distributors to return unsold films; and a conflict of law provision.

In December 1986, plaintiff filed this breach of contract action against defendant. Count I of the third amended complaint alleged that the parties entered into a written contract for distribution of the film and that Embassy made an oral promise to sell 100,000 copies of the film as part of their agreement. Geoquest alleged that Embassy breached this oral promise. Count I also alleged that Geoquest altered its pricing structure based upon defendant's oral promise to sell a minimum of 100,000 videocassettes. Count II alleged a breach of the August 20 written agreement.

Prior to trial, the trial court granted Embassy's motion to bar parol evidence concerning the alleged oral promise. The court found the written agreement complete and unambiguous, and stated that if an oral contract existed, it was absorbed into the written agreement. Geoquest then voluntarily dismissed count II. Embassy filed a motion for summary judgment as to count I, on the ground that the trial court's *in limine* ruling barred any evidence related to an alleged oral promise to sell 100,000 copies of the videocassette. The court then granted summary judgment in favor of defendant. Although plaintiff appeals from the summary judgment order pursuant to Supreme Court Rule 301 (134 Ill. 2d R. 301), the parties stipulated that the only issue on appeal would be whether the trial court properly granted the *in limine* motion. In this regard, the parties also stipulated that if the trial court improperly granted the *in limine* motion, then the summary judgment in defendant's favor was also improper.

■ Under the parol evidence rule, extrinsic or parol evidence concerning a prior or contemporaneous agreement is not admissible to vary or contradict a fully integrated writing. (*Commonwealth Eastern Mortgage Co. v. Vaughn* (1989), 179 Ill. App. 3d 129, 534 N.E.2d 453; *Johnson v. Flueckiger* (1980), 81 Ill. App. 3d 623, 401 N.E.2d 1317.) Parol or extrinsic evidence may not be introduced to show additional

consistent terms of a contract unless the writing is incomplete or ambiguous. (*Koester v. Weber, Cohn & Riley, Inc.* (1989), 193 Ill. App. 3d 1045, 550 N.E.2d 1004; *Johnson v. Flueckiger*, 81 Ill. App. 3d 623, 401 N.E.2d 1317.) Plaintiff here claims that the letter did not contain the parties' final agreement and that plaintiff anticipated a subsequent, more formal document. Plaintiff, however, does not maintain that the agreement or its terms were ambiguous.

The threshold question for our review then is whether the August letter was a fully integrated writing. The question of whether a document constitutes a fully integrated agreement has been characterized as a question of law to be determined by the trial court. (*Pecora v. Szabo* (1981), 94 Ill. App. 3d 57, 418 N.E.2d 431.) Under the four corners test, the court must find from the contract itself that the document is incomplete before it will allow the admission of extrinsic evidence. (See *Kolar v. Ray* (1986), 142 Ill. App. 3d 912, 492 N.E.2d 899.) Our courts have also considered the circumstances of the case and any relevant evidence in order to determine whether the document was intended as a total integration. (*Hartbarger v. SCA Services, Inc.* (1990), 200 Ill. App. 3d 1000, 558 N.E.2d 596; *Lewis v. Loyola University* (1986), 149 Ill. App. 3d 88, 500 N.E.2d 47; *Maas v. Board of Trustees of Community College District No. 529* (1981), 94 Ill. App. 3d 562, 418 N.E.2d 1029.) Under either test and after consideration of both the contract language and the circumstances, we conclude that the document in this case was an integrated contract, and the trial court therefore properly excluded parol evidence.

The plain and unambiguous contract language convinces us that the parties intended to be bound by the letter document. The paragraph above the signature lines in the executed document provided:

> "If I've got the essential terms right, please indicate [your] agreement by signing and returning the enclosed copy. *** Until such time, if ever, that we execute a more formal agreement, this letter will serve to reflect the *binding agreement* between the parties." (Emphasis added.)

The writing acknowledged revisions of the initial July 26 draft and then expressly stated that this letter "can now serve to confirm our agreement." Geoquest executed and returned the letter agreement to Embassy as requested. By so doing, Geoquest indicated that it considered this document to be a "binding agreement." The language unambiguously demonstrates the parties' intent to be bound by the letter's terms. Nor does the fact that the letter referred to the possibility of a subsequent, more formal agreement prevent this letter from being an integrated contract. (*Chicago Investment Corp. v. Do-*

*lins* (1985), 107 Ill. 2d 120, 481 N.E.2d 712.) Indeed, the language also contemplates that a more formal agreement might never be drawn and expressly provides that this letter constitutes the parties' binding agreement "until such time, if ever" that a subsequent agreement is drawn. Clearly, the writing did not make the execution of a more formal agreement a condition precedent to a binding contract, nor did it indicate that the parties could cancel their agreement if they did not execute a more formal document. (See *Quake Construction, Inc. v. American Airlines, Inc.* (1990), 141 Ill. 2d 281, 565 N.E.2d 990.) Instead, the letter was the parties' "binding agreement." Moreover, nothing suggests that any subsequent, more formal document would not be substantially based upon the terms of this letter. (*Chicago Investment Corp. v. Dolins*, 107 Ill. 2d 120, 481 N.E.2d 712.) Simply, the plain language of the document belies plaintiff's argument that the agreement is not integrated.

Nor do the circumstances in this case require a different result. The written document here was the third version of the parties' agreement and was signed by both parties after rather extensive negotiations and substantial revisions in its terms. Nor does the record reveal that plaintiff executed this document under duress or through fraud. Moreover, although defendant's agents referred to sales in excess of 100,000 videocassettes, we do not believe that the parties intended such "projection" to be a term of their distribution agreement. Indeed, Embassy requested Geoquest's agreement "[i]f *** the essential terms [are] right." The alleged 100,000-unit sales guarantee, which would assure Geoquest revenues of more than $800,000 and have tremendous economic consequences for both parties, would certainly be considered an "essential term" of the agreement. Under the circumstances, we believe that if the parties intended to make such alleged guarantee a term of their agreement, they would have included it in the written document that the parties signed. The absence of a minimum sales term in the contract, unlike the missing term for compensation in *Koester*, does not render the contract incomplete. Rather, the failure to include this term after several revisions, particularly in light of the language stating that the letter contained "the essential terms," convinces us that the parties did not intend to include a 100,000-unit minimum sales guarantee.

Plaintiff relies heavily on Bleimeister's testimony that the letter omitted "a great many" terms. We are unpersuaded, however, that this testimony requires a contrary result. The omitted provisions from the parties' agreement are relatively insignificant when compared to the alleged sales minimum. *Roth v. Meeker* (1979), 72 Ill. App. 3d 66,

389 N.E.2d 1248, cited by defendant, is instructive on this issue. In *Roth*, plaintiff sought damages allegedly resulting from defendant's refusal to vacate possession of premises leased to plaintiffs from the purchaser of defendant's land. Defendant tried to introduce testimony that he entered into an oral contract with the purchaser to retain possession of certain buildings. This court found such testimony barred under the parol evidence rule because such alleged oral promise would normally have been incorporated into the written agreement. Under *Roth*, the alleged oral promise in this case to guarantee minimum sales normally would have been included in the written agreement containing "the essential terms." Its absence supports the ruling of the trial court.

Nor does *Lewis v. Loyola University* require us to find that the letter agreement was incomplete, as plaintiff maintains. In *Lewis*, the parties executed a letter agreement appointing plaintiff to defendant's faculty. Defendant moved to bar evidence under the parol evidence rule of an alleged prior promise via letter to recommend plaintiff for tenure. This court concluded that the contract did not express the parties' complete agreement and that the trial court, therefore, properly allowed the parol evidence. In so deciding, this court stated "[i]t cannot seriously be argued that a form contract for a teaching position" embodies the parties' complete agreement and understanding. (*Lewis*, 149 Ill. App. 3d at 93, 500 N.E.2d at 50.) The court also noted that the language of the prior letter indicated that the letter was part of the contract. *Lewis* is inapposite here because the language in the agreement between Geoquest and Embassy unequivocally stated that the letter constituted the parties' "binding agreement." Moreover, the agreement, which contained detailed and specific terms, cannot be characterized as "a form contract" as was the case in *Lewis*.

We also reject plaintiff's claim that the parol evidence rule does not apply because the agreement was an oral contract, inasmuch as it was partly written and partly oral. This claim is belied by the unambiguous language characterizing the letter agreement as binding. If the parties intended the alleged oral promise to be part of their contract, we believe that the written document certainly would have included this substantial term. Moreover, it is well settled that all prior negotiations are merged into a written contract which is conclusively presumed to include all material terms. (*Johnson v. Flueckiger*, 81 Ill. App. 3d 623, 401 N.E.2d 1317; *Lewis v. Loyola University*, 149 Ill. App. 3d 88, 500 N.E.2d 47.) The detailed written agreement resulted from two earlier drafts and continuing negotiations. We believe that the parties had ample opportunity prior to executing this agree-

ment to reduce the alleged sales minimum to writing if in fact such promise existed as a term of their contract.

The totality of the record in this case convinces us that the parties intended to be bound by the August 20 letter agreement, as revised. Because we so decide, we need not determine whether the alleged minimum sales guarantee was a consistent term.

For the above-stated reasons, we conclude that the trial court properly found that the executed letter was an integrated contract and therefore properly barred evidence of the alleged oral promise to guarantee minimum sales under the parol evidence rule. We accordingly affirm the order of the circuit court of Cook County granting defendant's motion *in limine* and its subsequent order granting summary judgment for defendant.

Judgment affirmed.

EGAN, P.J., and RAKOWSKI, J., concur.