Osborne Allen PAYNE and Broadway
Payne, Inc., Plaintiffs,

v.

McDONALD'S CORPORATION,
Defendant.

Civil No. H–96–3409.

United States District Court,
D. Maryland.

Feb. 13, 1997.

Steven P. Pavsner, Greenbelt, MD and Robert Zarco, Zarco and Pardo, Miami, FL, for Plaintiffs.

Stephen H. Sachs, Wilmer, Cutler and Pickering, Washington, DC (Charles A. Mendels, Alex E. Rogers, and Lara A. Englund, of Wilmer, Cutter & Pickering, and Douglas C. Gessner, Senior Corporate Attorney, McDonald's Corporation), for Defendant McDonald's Corporation.

### MEMORANDUM OPINION

ALEXANDER HARVEY, II, Senior District Judge.

In this civil action, a franchisee and a corporation controlled by him have sued a franchisor, invoking the Court's diversity jurisdiction. Plaintiff Osborne Allen Payne ("Payne") has for many years been the owner and operator of four so-called "fast food" restaurants in the City of Baltimore, pursuant to franchise agreements with defendant McDonald's Corporation ("McDonald's"). Plaintiff Broadway Payne, Inc. is a Maryland corporation through which Payne has controlled some or all of his interests in these franchises. In their six count complaint, the plaintiffs have alleged, *inter alia*, that defendant McDonald's has breached various provisions of license agreements between the parties by opening new McDonald's restaurants near one of plaintiffs' facilities, by refusing to assist plaintiffs in the sale of their restaurants, and by engaging in other unfair and unreasonable conduct. Claims of fraud have also been asserted in the complaint. Plaintiffs here seek compensatory and exemplary damages, rescission of the contracts and other relief.[1]

Presently pending before the Court is defendant's motion to dismiss filed pursuant to Rule 12(b) and Rule 9(b), F.R.Civ.P. Memoranda and exhibits have been filed by the parties in support of and in opposition to the pending motion, and a hearing on the motion has been held in open court. For the reasons stated herein, defendant's motion to dismiss will be granted.

## I

### Facts

The relevant facts, taken from the complaint in the light most favorable to the plaintiffs, are as follows.[2] Plaintiff Payne is a resident of Baltimore, Maryland. Plaintiff Broadway Payne, Inc. is a Maryland corporation with its principal place of business in Baltimore, Maryland. Defendant McDonald's Corporation is a Delaware corporation, with its principal place of business in the State of Illinois.

Besides operating company-owned restaurants, McDonald's issues franchises to individuals and entities throughout the United States on a competitive basis. The franchise relationship between McDonald's and its franchisees is based upon several agreements: a Franchise Letter Agreement, a License Agreement, and an Operator's Lease. Pursuant to these agreements, franchisees are authorized to adopt and use the so-called "McDonald's System." The McDonald's System refers to the concept of restaurant operations which has been developed by McDonald's including, *inter alia*, its proprietary rights in trademarks, manuals, and other confidential business information, and its operational, real estate, and marketing information concepts. Most License Agreements have a twenty-year duration, and they are subject to renewal at McDonald's sole discretion.

One of the License Agreements at issue in this case was executed by the parties in 1974. Payne opened his first McDonald's restaurant at 2035 North Broadway (the "Broadway restaurant") in Baltimore City in May of 1974. In December of 1976, Payne opened his second McDonald's restaurant at 1812 North Charles Street (the "Charles Street restaurant"). Around the same time, Payne built and opened this third franchised restaurant at 524 West Franklin Street (the "Franklin Street restaurant").[3]

Some time during the middle of 1988, McDonald's notified Payne that it intended to open a new restaurant (the "Greenmount restaurant"), which would be located on Greenmount Avenue some three-quarters of a mile away from his Broadway restaurant. McDonald's offered Payne the opportunity to operate the facility at this new site. Payne objected to the location of a new restaurant

---

1. At the hearing held on defendant's motion to dismiss, plaintiffs withdrew their request for rescission of the agreements at issue.

2. The complaint is some 30 pages in length and contains detailed allegations of the circumstances leading to the parties' dispute. Attached to the complaint and incorporated as a part thereof are numerous pertinent documents.

3. During 1976, Mr. Payne also operated for McDonald's a company-owned restaurant on Eutaw Street. Two years later, when the Eutaw Street restaurant was closed, Payne purchased another McDonald's restaurant at 6005 Liberty Road, which he operated for only three years.

on Greenmount Avenue, claiming that it would adversely affect his Broadway operation. It was McDonald's belief on the other hand that the impact would be minimal. Payne contends that he reluctantly agreed to open the Greenmount restaurant, and he signed a Franchise Letter Agreement for that location on December 28, 1988.

Nearly two years later, in November of 1990, McDonald's decided to open another facility (the "Harford and Moravia restaurant") which would be located two miles north of the Broadway restaurant. According to Payne, McDonald's ignored his concerns that the location of this new facility would adversely affect the business of his Broadway restaurant. A third party franchisee later opened and has operated the Harford and Moravia restaurant. It is alleged that, during the first year of that restaurant's operation, Payne lost more than $300,000 in gross sales at his Broadway facility, a 14.6 percent decrease.

On several occasions in 1991, Payne spoke with a McDonald's regional manager and field consultant in an attempt to obtain compensation for his loss of sales at the Broadway location. At the time, representatives of McDonald's suggested that Payne should rebuild his Broadway restaurant to conform to its new, so-called "Series 2000" facilities. For several reasons, Payne objected and expressed his reluctance to go forward with the rebuilding proposal. According to Payne, McDonald's informed him that the cost of rebuilding his nearly twenty-year-old store would be less expensive than the cost of merely remodeling it. However, Payne believed that the cost involved would be much more than McDonald's had estimated and also that the rebuilt restaurant would not be as profitable as McDonald's had projected because a Series 2000 restaurant would hold only 40 customers, rather than the existing 110 person capacity. Payne also feared that remodeling his Broadway facility as a Series 2000 restaurant would create new security problems and would result in more robberies at the Broadway site.

Payne's Broadway franchise was to expire on May 30, 1994. In a letter dated March 30, 1993, McDonald's notified Payne that its renewal of the Broadway franchise agreement for an additional twenty years would be conditioned on his agreeing to rebuild the store. In spite of his stated objections to and concerns about the rebuilding of the Broadway restaurant, Payne later agreed to McDonald's terms, and he signed a Letter Agreement on April 2, 1993. The rebuilding then went forward, and a new twenty-year License Agreement for the Broadway restaurant was signed by Payne on March 15, 1994.

McDonald's had estimated the cost of the rebuilding to be $700,000. Payne contends that such cost in fact amounted to $1.5 million. However, Payne has included in this figure an increase in the rent payable over a twenty-year period, which McDonald's was charging in exchange for its contribution to the cost of the rebuilding. Accordingly, the cost of the rebuilding was apparently $950,000, or $250,000 in excess of McDonald's original estimate.

Because of declining business, Payne has since 1993 been trying to sell his four restaurants. According to Payne, McDonald's has been able to locate only one potential buyer for his restaurants but that buyer has recently decided not to purchase them. Payne contends that McDonald's has been attempting to frustrate his efforts to sell his restaurants. He maintains that a McDonald's field consultant recently gave his Broadway restaurant a low inspection rating and told him that he must spend more than $130,000 for modernizing and renovations before he would be able to sell his restaurants. According to Payne, a local McDonald's operator called the McDonald's regional manager to request McDonald's approval for that party's purchase of Payne's Greenmount restaurant. This unidentified party was allegedly told that "McDonald's had other plans for Mr. Payne." Payne speculates that McDonald's is attempting to force him to sell his restaurants to McDonald's at below their fair market value.

As noted, Payne currently owns four McDonald's restaurants, the Broadway restaurant, the Charles Street restaurant, the Greenmount restaurant, and the Franklin

Street restaurant.[4] On October 30, 1996, Payne filed a six count complaint in this Court. Count I alleges that McDonald's breached the 1974 License Agreement for the Broadway restaurant (1) by opening the Greenmount restaurant in 1988, and (2) by opening the Harford and Moravia restaurant in 1990. It is also alleged in Count I that McDonald's breached the License Agreements covering Payne's four restaurants by failing to help him sell them. Count II alleges that McDonald's breached an implied covenant of good faith and fair dealing (1) by opening new restaurants near Payne's Broadway restaurant; (2) by violating its own non-encroachment policy; (3) by requiring Payne to rebuild his Broadway restaurant as a condition to the renewal of the franchise agreement for that restaurant; and (4) by refusing to assist Payne with the sale of his restaurants. Counts III through VI allege fraud-based claims based on McDonald's alleged misrepresentations in projecting: (1) the cost of rebuilding the Broadway restaurant; (2) the profits of the Broadway restaurant after the rebuilding; and (3) the loss of sales at the Broadway restaurant caused by the opening of the Greenmount and Harford and Moravia restaurants.

On January 23, 1997, McDonald's filed a complaint in this Court in a separate action, naming the Payne parties as defendants. *McDonald's Corporation v. Payne, et al.,* Civil No. H–97–210. In that suit, McDonald's has alleged that the Payne parties have breached their franchise agreements by failing to pay service fees and percentage rent for their four restaurants. As a part of the relief sought in that case, McDonald's has requested this Court to enter a temporary restraining order and a preliminary injunction ejecting the Payne parties from the restaurants in question and enjoining them from using McDonald's trade names and trademarks. At a hearing held in that case on January 27, 1997, this Court denied McDonald's motion for a temporary restraining order.[5]

II

*Applicable Principles*

■ Both sides have in their memoranda quoted from and construed documents attached to the complaint or referred to therein. This court may consider these documents without converting the pending motion to dismiss into a motion for summary judgment. *See Anheuser–Busch, Inc. v. Schmoke,* 63 F.3d 1305, 1312 (4th Cir.1995), *cert. granted and judgment vacated on other grounds,* —— U.S. ——, 116 S.Ct. 1821, 134 L.Ed.2d 927 (1996); *Doe v. First Nat'l Bank,* 865 F.2d 864, 873 (7th Cir.1989); 5A Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure* § 1357, p. 347 (1990).

It is well established that a motion to dismiss under Rule 12(b)(6), F.R.Civ. P., should be denied unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). In determining whether to dismiss a complaint, this Court must view the well-pleaded material allegations in a light most favorable to the plaintiff, with the alleged facts accepted as true. 2A *Moore's Federal Practice,* 12.07 [2.–5] (2d ed.1987); 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357, at 304–21 (1990).

Applying these principles to the circumstances here, the Court has concluded that defendant's motion to dismiss must be granted.

III

*Discussion*

It is apparent that the dispute between the parties in this case has arisen because of declining revenues in recent years at plaintiffs' four restaurants. Pleadings and hearings in this case and in Civil No. H–97–210

---

**4.** The Franklin Street restaurant has recently been closed because of declining revenues.

**5.** A hearing on McDonald's motion for a preliminary injunction has been scheduled for February 24, 1997.

indicate that plaintiff Payne has recently been losing money and no longer has a positive cash flow at his restaurants.[6] Sales have been decreasing at Payne's facilities, which are located in high crime areas in the City of Baltimore. As noted in the complaint, robberies at the Broadway restaurant have increased. There have been continuous break-ins at that location since 1993, as a result of which Payne has been forced to hire a guard service and reduce the restaurant's hours of operation.

As a result of the downturn in his business operations, Payne approached McDonald's and requested a reduction in the rent and license fees payable under the existing agreements. Additionally, since 1993, Payne has undertaken efforts to find buyers for his restaurants. When neither of these efforts proved successful in alleviating his financial difficulties, Payne, on his own and without the consent of McDonald's, reduced the amounts being paid by him to McDonald's as service fees and percentage rent. He also has filed this civil action asking this Court to determine that McDonald's is responsible for his business difficulties. But, as earnestly as Payne and his counsel have struggled to come up with some legal theory which would establish culpability on the part of McDonald's for Payne's unfortunate business reverses, none of his claims is legally sustainable. The problem faced by plaintiffs in claiming a breach of contract by McDonald's is their inability to point to any provision in the express and unambiguous agreements between the parties which has been breached by McDonald's. Nor do the facts alleged by the plaintiffs support their claim that they have sustained damages because of misrepresentations made by McDonald's. For these reasons, the complaint must be dismissed.

(a)

*Count I*

*Breach of Contract*

In responding to plaintiff's breach of contract claims asserted in Counts I and II of the complaint, McDonald's argues that these claims must fail as a matter of law because plaintiffs can point to no provision in the agreements which support such claims. This Court would agree.

The critical provisions at issue here are contained in Paragraph 28 of the License Agreements executed by plaintiff Payne. In pertinent part, the provisions which the Court has been called on to construe in this case are as follows:

28. Acknowledgement. Licensee acknowledges that:

(a) The term of this license is for a single twenty (20) year term with no promise or representation as to the renewal of this License or the grant of a new License;

\* \* \* \* \* \*

(e) That this License establishes a Restaurant at the location specified in sub-paragraph 2(a)(i) only and that no "exclusive," "protected," or other territorial rights in the contiguous market area of such Restaurant is hereby granted or inferred;

(f) That this License supersedes any and all other agreements, representations, respecting the Restaurant and contains all the terms, conditions, and obligations of the parties with respect to the grant of this License;

\* \* \* \* \* \*

■■■ These unambiguous contractual provisions to which plaintiffs have repeatedly assented defeat the breach of contract claims asserted by plaintiffs in this case. As the parties have agreed, Illinois law applies here. Pursuant to that law, a court in interpreting provisions of a contract looks first to the express language of the parties' agreement. *Quake Constr., Inc. v. American Airlines, Inc.*, 141 Ill.2d 281, 152 Ill.Dec. 308, 312, 565 N.E.2d 990, 994 (1990). Under Paragraph 28(e) of the License Agreements, Payne has no right to an exclusive market area for the operation of his franchise. He has expressly agreed that no exclusive, protected or other territorial rights in the contiguous area surrounding the Broadway restaurant have been granted to him, nor may any such right be

**6.** At the hearing in this case, counsel for plaintiffs claimed that Payne was "on the verge of bankruptcy."

inferred from other provisions of the contract. Indeed, on two separate occasions, once in 1988 and later in 1994, Payne executed new franchise agreements, knowing that McDonald's interpreted Paragraph 28(e) as permitting it to open new restaurants in areas near the Broadway restaurant.

In *Sanchez v. McDonald's Corp.*, Civil No. K–91–2135 (D.Md. May 10, 1993), Judge Kaufman of this Court had before him the very same contractual provisions involved in this case. In his oral opinion rendered in open court in that case on May 10, 1993, Judge Kaufman held that the language of Paragraph 28(e) foreclosed a claim of breach of contract asserted by franchisee Sanchez on the ground that the opening of another restaurant in a contiguous area violated his contractual rights. In a *per curiam* opinion, the Fourth Circuit affirmed on the reasoning of the district court. *Sanchez v. McDonald's Corp.*, No. 93–1800, 1994 WL 83892 (4th Cir. Mar. 14, 1994).

■ In *Sanchez*, Judge Kaufman cited in support of his ruling the *per curiam* Fourth Circuit opinion in *Fickling v. Burger King Corp.*, No. 87–1725, 1988 WL 30675 (4th Cir. Apr.4, 1988).[7] In *Fickling,* the franchisees had relied on extrinsic evidence in claiming that the granting by the franchisor of new Burger King franchises in their areas had violated existing exclusivity agreements between the parties. In affirming the district court's rejection of the plaintiffs' claims, the Fourth Circuit held that the existence of any such exclusivity agreements was "flatly contradicted by clauses in the various franchise agreements that expressly disavow any grant of exclusive territory in plaintiff's favor" and that, in the face of "express and unambiguous provisions" in the agreements, plaintiffs' claims of violations of customary practices had been properly dismissed by the district

court as contrary to the terms of the franchise agreements. *Fickling,* 1988 WL 30675, at *1. Similarly, in this case, plaintiffs contention that McDonald's has violated its policy of non-encroachment must fail because of unambiguous provisions in the franchise agreements which disavow the existence of any such policy.

■ The very same result as that in *Sanchez* was reached by the United States District Court for the Northern District of California and by the Ninth Circuit. In *Chang v. McDonald's Corp.*, [1995–1996 Transfer Binder] Bus. Franchise Guide (CCH) ¶ 10,-677 (N.D.Cal. May 2, 1995), the very same provisions of the franchise agreements at issue here were construed by the district court, which concluded that, under Illinois law, defendant McDonald's had not "encroached" upon plaintiff's sales by opening two new restaurants in plaintiff's market area. *See Id.* at 26727–30. That ruling has recently been affirmed by the Ninth Circuit in a Memorandum Opinion.[8] *Chang v. McDonald's Corp.*, No. 95–06012, 1996 WL 742455 1996 U.S.App. LEXIS 33288 (9th Cir. Dec. 19, 1996) (suggestion for rehearing *en banc* pending).[9]

The *Chang* rulings are in complete accord with Judge Kaufman's interpretation in *Sanchez* of the same provisions of Paragraph 28(e). As noted, Judge Kaufman's decision was affirmed by the Fourth Circuit. In both the district court opinion and the Ninth Circuit opinion in *Chang,* the courts, in holding that the franchisee had not bargained for exclusive territorial rights, relied on *Patel v. Dunkin' Donuts of America, Inc.*, 146 Ill. App.3d 233, 100 Ill.Dec. 94, 96, 496 N.E.2d 1159, 1161 (1986). In *Patel,* the Court rejected a franchisee's claim that an exclusive territorial provision could be implied when none

---

7. Plaintiffs object to this Court's consideration of the *Fickling* opinion, claiming that defendant's citation of that ruling would violate Local Rule 36(c). This Court would disagree. Although *Fickling* was an unpublished opinion, counsel for McDonald's had every right to believe that the opinion had "precedential value in relation to a material issue in the case" and that there is no published Fourth Circuit opinion "that would serve as well ...." *See* Local Rule 36(c).

8. Relying on Ninth Circuit Rule 36–3, plaintiffs here contend that since the Ninth Circuit's Memorandum Opinion was not published, this Court may not cite or rely on the ruling. However, that Ninth Circuit Rule applies only to "courts of this circuit."

9. The Ninth Circuit has not as yet ruled on the franchisee's pending petition for rehearing with suggestion for rehearing *en banc* in the *Chang* case.

existed in the agreement. Explaining that "Illinois courts favor fair competition and do not encourage restraints on trade," the Court in *Patel* dismissed plaintiff's complaint as a matter of law because the license agreement between the parties did not contain any limit on the franchisor's ability to open another store in the vicinity of that being operated by the franchisee. *Id.* at 96, 496 N.E.2d at 1161. In *Chang,* the Ninth Circuit specifically held that based on the express provisions of the same Paragraph 28(e) which is before the Court in this case, the plaintiff had no right to an exclusive market area. *Chang,* 1996 WL 742455 at *2, 1996 U.S.App. LEXIS 33288, at *2–3.[10] As in *Sanchez* and *Chang,* McDonald's in this case is not only not limited in its ability to open another restaurant near plaintiffs' Broadway location but there is even express language stating that no protected territorial rights have been granted to the plaintiffs, and that none may be inferred from other provisions of the agreement. For the reasons stated in *Sanchez* and *Chang,* this Court is satisfied that the claim of breach of contract asserted in Count I of the complaint must fail. The clear intent of Paragraph 28(e) is that Payne has no right to prohibit McDonald's from opening a new restaurant in the vicinity of Payne's Broadway facility.[11]

In claiming that McDonald's is in breach of the License Agreement which pertains to the Broadway restaurant, plaintiffs have relied on internal policies and practices of McDonald's which they contend form a part of the contract between the parties. According to plaintiffs, McDonald's has for some time observed a non-encroachment policy insofar as their franchisees are concerned, and plaintiffs argue that this policy has been expressly incorporated into the License Agreement by

Paragraph 3, entitled "General Services of Licensor."

■■■ For several reasons, this argument must fail. First, the integration clause contained in the License Agreement does not permit the plaintiffs to rely on documents not expressly incorporated therein. Paragraph 28(f) clearly provides that any and all other agreements and representations respecting the Broadway restaurant are superseded and states that the License Agreement "contains *all* the terms, conditions and obligations of the parties." License Agreement ¶ 28(f) (emphasis added). The License Agreement is neither incomplete nor ambiguous in this respect, and extrinsic evidence may not be introduced to show that additional terms of the contract exist. *Geoquest Prods., Ltd. v. Embassy Home Entertainment,* 229 Ill. App.3d 41, 170 Ill.Dec. 838, 841, 593 N.E.2d 727, 730 (1992). For a document to be incorporated by reference, the contract must show an intent to incorporate that other document and make it a part of the contract. *Harrison v. Sears, Roebuck & Co.,* 189 Ill.App.3d 980, 137 Ill.Dec. 494, 499, 546 N.E.2d 248, 253 (1989). *Duldulao v. Saint Mary Hospital,* 115 Ill.2d 482, 106 Ill.Dec. 8, 11–13, 505 N.E.2d 314, 317–19 (1987), relied on by plaintiffs is not to the contrary. Since plaintiff in that case was an at-will employee and had no employment contract, it was held that he was entitled to rely on provisions of an employee handbook in asserting his breach of contract claim.

Second, the provisions of the License Agreement which plaintiffs contend have incorporated established policies of McDonald's relate to the parties' operational obligations and pertain only to the details of restaurant operations such as food, service and the supplying of standardized equipment. The pro-

10. Not only were the issues before the Ninth Circuit in *Chang* essentially the same as those before this Court in this case, but also plaintiff Chang was represented by the same attorneys who represent the plaintiffs in this case and who have filed substantially the same brief in opposing defendant's motion to dismiss as that submitted to the Ninth Circuit.

11. By way of comparison, many franchise agreements do indeed contain an exclusivity provision prohibiting encroachment by the franchisor. In

*Chadha, et al. v. Kiddie Academy International, Inc.,* Civil No. H–95–3889 (D.Md. Mar. 14, 1996), the franchisor granted the franchisees an exclusive franchise to develop child care learning centers in six counties in central New Jersey. In its Memorandum and Order of March 14, 1996, this Court granted the franchisees' motion for a preliminary injunction and enjoined the franchisor defendant during the pendency of the suit from taking any actions inconsistent with the exclusive franchise granted to the franchisee plaintiffs.

visions in question do not indicate any intention on the part of the parties to incorporate by reference other documents which would limit McDonald's right to open another restaurant in a contiguous area. Both the district court and the Ninth Circuit in *Chang* specifically so held. *See Chang,* 1996 WL 742455 at *2, 1996 U.S.App. LEXIS 33288, at *3, 4.

Plaintiffs' encroachment claim asserted in Count I of the complaint relates only to the Broadway restaurant. Insofar as all four of Payne's restaurants are concerned, including his three other restaurants which have not been allegedly subjected to encroachment, the further claim in Count I is that McDonald's breached the franchise agreements by failing to assist Payne in the sale of his restaurants.[12] Once again, there is no provision in any of the agreements which imposes any obligation on McDonald's to assist plaintiffs in the sale of their franchises.

Plaintiffs argue that McDonald's arbitrary and unreasonable failure to assist them with the sale of their restaurants constitutes a material breach of Paragraph 3 of the franchise agreements, which provides in pertinent part as follows:

> 3. General Services of Licensor. Licensor shall advise and consult with licensee periodically in connection with the operation of the Restaurant and also, upon licensee's request, at other reasonable times. Licensor shall also make available to licensee all additional services, facilities, rights and privileges relating to the operation of the Restaurant which Licensor makes generally available from time to time, to all its licensees operating McDonald's Restaurants.

According to plaintiffs, McDonald's regularly assists its franchisees in the sale of their restaurants but has failed to offer the same services to plaintiffs. As discussed hereinabove, the language of this "General Services" paragraph of the License Agreements pertains only to advice and consultations in connection with the operation of the Restaurant. Paragraph 3 specifically pro-

vides that the additional services in question are those "relating to the operation of the Restaurant." There is nothing in the agreements indicating that McDonald's has assumed an obligation to assist in the sale of a restaurant by a franchisee who has encountered business difficulties. Moreover, Paragraph 28(f), the integration clause, precludes this Court from considering extrinsic evidence disclosing what assistance McDonald's may have rendered to some other franchisee under different circumstances. In *Chang,* the Ninth Circuit construed these same provisions of Paragraph 3 as referring "only to the obligations of the parties relating to the details of restaurant operation." *Chang,* 1996 WL 742455 at *1., 1996 U.S.App. LEXIS, 33288 at *3. That Court also relied on Paragraph 28(f), the integration clause, in concluding that the parties to the franchise agreement had not intended to incorporate by reference other documents regarding McDonald's policies. *Id.* at *2.

In sum, these were negotiated franchise agreements, and, it was not a part of the bargain that plaintiffs would have exclusivity rights or that McDonald's would assist them if they wished to sell their restaurants. For all the reasons stated, this Court concludes that plaintiffs have as a matter of law failed to state an actionable claim in Count I of their complaint.

### (b)

### *Count II*

### *Breach of Implied Covenant of Good Faith and Fair Dealing*

In Count II of the complaint, plaintiffs claim that defendant McDonald's breached the implied covenant of good faith and fair dealing which formed a part of the agreements between the parties. According to plaintiffs, McDonald's breached this implied covenant (1) by opening the Greenmount and Harford and Moravia restaurants; (2) by violating its own non-encroachment policy; (3) by requiring plaintiffs to rebuild their Broadway restaurant as a condition for Mc-

---

**12.** McDonald's did itself offer to purchase plaintiffs' restaurants for $1.5 million. That offer was rejected by Payne.

Donald's renewal of the Franchise Agreement; and (4) by refusing to assist with and hindering the sale of their restaurants.

 Under Illinois law, an implied covenant of good faith and fair dealing forms a part of all contracts, absent express disavowal. *Dayan v. McDonald's Corp.*, 125 Ill. App.3d 972, 81 Ill.Dec. 156, 169, 466 N.E.2d 958, 971 (1984). However, Illinois law also recognizes that this covenant of good faith and fair dealing is not an independent source of duties but instead "guides the construction of explicit terms in an agreement." *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443 (7th Cir.1992). In the absence of an explicit term of the agreement, a plaintiff is not entitled to rely on the covenant of good faith and fair dealings to imply such a duty. *Id.*

 Plaintiffs argue that the conduct of McDonald's challenged here is inconsistent with their reasonable expectations under the License Agreements. This Court cannot agree. There is no provision in the agreements which imposes a limitation on McDonald's right to open new restaurants near existing franchises. The agreements are not ambiguous in this respect. As discussed hereinabove, the Broadway License Agreement contains no terms which require that McDonald's may open a new restaurant only if it does not encroach on the territory of the Broadway restaurant. Rather, the License Agreements clearly indicate that no such territorial protection is afforded to Payne. The Ninth Circuit reached the same conclusion in the *Chang* case. The Court there held that the franchisee's reliance on an implied covenant of good faith and fair dealing was unavailing because the contract terms (the same ones at issue in this case) "clearly and unambiguously" provided that McDonald's was under no obligation to refrain from opening restaurants near Chang's facility. *Chang,* 1996 WL 742455 at *2, 1996 U.S.App. LEXIS, 33288 at *7.

 Similarly, as also discussed hereinabove, the franchise agreements by their express terms do not require that McDonald's must assist Payne when he decides to sell one or more of his restaurants. Under Illinois law, express terms of these agreements preclude the assertion by plaintiffs of a claim for breach by McDonald's of an implied covenant of good faith and fair dealing. *Resolution Trust Corp. v. Holtzman,* 248 Ill.App.3d 105, 187 Ill.Dec. 827, 833, 618 N.E.2d 418, 424 (1993).

[15] Finally, plaintiffs argue that they are entitled to a recovery under Count II because McDonald's acted unfairly when it required plaintiffs to incur considerable expense in rebuilding and modernizing the Broadway restaurant. By its terms, the Broadway License Agreement was to expire in 1974. In March of 1993, McDonald's indicated that it would be willing to renew the agreement "conditioned upon the restaurant being rebuilt." Payne objected but following negotiations between the parties eventually agreed to the rebuilding of the restaurant. McDonald's in turn agreed to enter into a new twenty-year franchise agreement with Payne. On May 15, 1994, the parties executed the new License Agreement. Plaintiffs contend that McDonald's breached the implied covenant of good faith and fair dealing which formed a part of the 1974 agreement by requiring Payne to rebuild the Broadway restaurant as a condition for the renewal of the agreement. There is no merit to this contention.

Pursuant to the unambiguous provisions of the 1974 agreement, the decision whether or not to renew the Broadway franchise was solely one for McDonald's to make. As provided in Paragraph 28(a), the term of the franchise "is set forth in Paragraph 2(b) hereof with no promise or representation as to the renewal of this franchise or the grant of a new franchise." Paragraph 2(b) of the 1974 License Agreement provided that the term would begin on May 31, 1974 and would end on May 30, 1994. Inasmuch as the 1974 agreement granted plaintiffs no right to renew the franchise, McDonald's was at liberty to impose conditions for renewal deemed appropriate by it for the furtherance of its business interests. Since McDonald's had no obligation to renew, it had the right to condition renewal on the requirement that Payne modernize the Broadway restaurant. In executing the new Franchise Agreement and in

then being granted a new twenty-year term, Payne agreed to McDonald's requirement that his restaurant be rebuilt and modernized. There was no duress or undue pressure under the circumstances here. Payne faced merely that economic pressure regularly encountered by a businessman when confronted with stringent demands during negotiations for renewal of a lease or other agreement.

 Plaintiffs argue that McDonald's violated its own "re-write policy" by requiring rebuilding of the Broadway store before the franchise would be renewed.[13] Once again, Paragraph 28(f), the integration clause, prohibits reliance by plaintiffs on an external document. Moreover, even if McDonald's re-write policy is considered, it is apparent that it has not been violated by McDonald's. Pertinent portions of the policy state that conditions may be imposed by McDonald's as a part of an agreement to renew a franchise, that these conditions must be satisfied prior to the expiration of the original franchise and that such conditions "frequently relate to the improvement of the restaurant facility to meet contemporary McDonald's standards." Under these circumstances, it was not unreasonable or a breach of the implied covenant of good faith and fair dealing for McDonald's to require that plaintiffs modernize their Broadway restaurant before the franchise was renewed.

In support of their contention that McDonald's conduct breached an implied covenant of good faith and fair dealing, plaintiffs place heavy reliance on *Scheck v. Burger King Corp.*, 756 F.Supp. 543 (S.D.Fla.1991) (*"Scheck I"*) and *Scheck v. Burger King Corp.*, 798 F.Supp. 692 (S.D.Fla.1992) (*"Scheck II"*). In *Scheck I*, a district court in Florida concluded that the implied covenant of good faith and fair dealing applied to Burger King's decision to open a new restaurant in the franchisee's market area, even though the franchise agreement expressly denied the franchisee an exclusive market area. In *Scheck II*, the same court reaffirmed its prior ruling and denied Burger King's motion for reconsideration.

For several reasons, this Court concludes that plaintiffs' reliance on the *Scheck* decisions is misplaced. First, *Scheck I* and *Scheck II* were decided under Florida law.[14]

---

13. In *Roseli, Inc. v. McDonald's Corp.*, No. CV 82–0–674 (D. Neb. June 20, 1986), the district court described McDonald's rewrite policy in some detail, as follows:

> The rewrite policy is an internal procedure used by McDonald's in determining whether it wishes to enter into a new franchise relationship at a specific restaurant location with a franchisee whose existing contracts are close to their expiration date. The procedure begins with a committee composed of McDonald's corporate officers (the rewrite committee) reviewing the past performance of the McDonald's restaurant and the past franchise relationship with the franchisee/operator of the restaurant being reviewed. The rewrite committee then decides whether McDonald's should enter into a new franchise relationship upon the franchise agreement's expiration. When the franchise contracts are held in the name of a corporation, as here, the rewrite committee also reviews and evaluates the past performances and relationship with the corporate franchisee's designated on-premises operator (in this instance, Mr. Schupack).
>
> If McDonald's decides to enter into a new franchise relationship, the corporation advises the franchisee of its decision and offers a new contractual relationship with the new term commencing on the expiration date of the existing franchise agreement.

Alternatively, if the rewrite committee decides to allow the existing franchise agreement to lapse pursuant to its terms and undertake no new franchise relationship with the franchisee, McDonald's notifies the franchisee of its decision. Along with the notification of the corporation's decision to deny the rewrite or renewal of the franchise, the franchisee is given the opportunity to sell its business as a going concern to a qualified buyer. If the franchisee locates a potential buyer, McDonald's reviews the buyer's qualifications to become an owner/operator of a restaurant. If the potential buyer is found to be qualified, McDonald's will offer that buyer a new full-term franchise. Finally, the rewrite policy stipulates that any sale of a restaurant must be consummated and approved by McDonald's prior to the franchise's stated expiration date.

14. Similarly, plaintiffs' reliance on *In re Vylene Enterprises, Inc.*, 90 F.3d 1472 (9th Cir.1996), is misplaced. That case dealt with California law pertaining to an implied covenant of good faith and fair dealing. The later *Chang* decision applied the quite different Illinois law. Moreover, *Vylene* relied on *Scheck I*, which, as discussed herein, has now been disavowed by other judges of the Southern District of Florida.

As discussed herein, Illinois law applies principles quite different from those of Florida law. Indeed, the Ninth Circuit in *Chang*, refused to follow *Scheck I*, concluding that the rationale of *Scheck* "conflicts with Illinois law." *Chang*, 1996 WL 742455 at *2, 1996 U.S.App. LEXIS, 33288 at *5–6. Moreover, in *Scheck II*, the district court acknowledged that the Fourth Circuit's decision in *Fickling* was contrary to the conclusion reached by it in *Scheck I*. Although Judge Hoeveler in *Scheck II* found *Fickling* not "persuasive" and decided "not [to] accept the conclusions reached therein," 798 F.Supp. at 699, this Court must follow and apply decisions of the Fourth Circuit.

Second, the *Scheck* decisions have been consistently disavowed by other judges of the Southern District of Florida. Most recently, the district court in *Barnes v. Burger King Corp.*, 932 F.Supp. 1420 (S.D.Fla.1996), declined to follow the *Scheck* decisions and rejected a franchisee's claim that Burger King had breached an implied covenant of good faith and fair dealing by permitting a new restaurant to be opened five blocks from the plaintiff's location. The Court held that since the express terms of the contract permitted Burger King to open additional franchises in the vicinity of the plaintiff's franchise, the Court would not enforce the plaintiff's claim for breach of the implied covenant of good faith. *Id.* at 1438.[15] To the same effect are *Burger King Corp. v. Holder*, 844 F.Supp. 1528 (S.D.Fla.1993) ("a cause of action for breach of the implied covenant of good faith and fair dealing cannot stand apart from a claim for breach of the contract's express terms"), and *Burger King Corp. v. Weaver*, No. 90–2191, [1995–1996 Transfer Binder] Bus. Franchise Guide (CCH) ¶ 10,762, at 27,251, 27,254 (S.D.Fla. Sept. 18, 1995) ("a claim for breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law absent an allegation that an express term of the contract has been breached"). Certainly, in view of these later decisions of other

judges of the Southern District of Florida, the *Scheck* rulings cannot be viewed as retaining any vitality.

For these reasons, this Court concludes that plaintiffs have as a matter of law failed to state an actionable claim under Count II of the complaint.

### (c)
### Counts III—VI
### Fraud

Counts III through VI of the complaint are based on allegations that McDonald's made various misrepresentations which caused damage to plaintiffs. Count III seeks a recovery for fraud and misrepresentation, and Count IV is based on a claim of negligent misrepresentation. Count V requests rescission of the contract on the basis of fraud,[16] and Count VI seeks a recovery based on promissory and equitable estoppel resulting from false representations made by McDonald's to Payne. Plaintiffs allege that McDonald's misrepresented (1) the cost of rebuilding the Broadway restaurant, (2) the projected profits of the Broadway restaurant after it was rebuilt and (3) the impact that the opening of the Greenmount and the Harford and Moravia restaurants would have on sales at the Broadway restaurant.

In seeking dismissal of plaintiffs' fraud-based claims, defendant McDonald's contends that they are not actionable (1) because they are merely predictive statements upon which plaintiffs could not reasonably rely and (2) because they are barred by limitations. It is agreed that Maryland law applies to the fraud-based claims asserted by plaintiffs in this case.

In *Miller v. Fairchild Industries, Inc.*, 97 Md.App. 324, 342, 629 A.2d 1293, *cert. denied*, 333 Md. 172, 634 A.2d 46 (1993), the Court of Special Appeals of Maryland, quoting *Finch v. Hughes Aircraft Co.*, 57 Md. App. 190, 232, 469 A.2d 867 (1984), explained that "predictions or 'statements which are merely promissory in nature and expressions

---

**15.** The language of the franchise agreement in *Barnes* is similar to that in Paragraph 28(e). In pertinent part, that agreement provided that the franchisee was granted "no exclusive territory or market area." 932 F.Supp. at 1436.

**16.** As noted, this claim has been withdrawn by plaintiffs.

as to what will happen in the future are not actionable as fraud.'" McDonald's contends here that the three misrepresentations alleged in the complaint, namely the projected cost of the rebuilding of the Broadway facility, the projected profits of the Broadway restaurant after it was rebuilt and the projected impact of the new restaurants on sales at the Broadway location, are all expressions as to what will happen in the future and are not actionable as fraud. This Court would agree.

By way of response, plaintiffs argue that predictive statements are indeed actionable when "the representing party has exclusive or superior knowledge and should have been aware that [the] other party would rely heavily on its assertions." *Miller v. Premier Corp.*, 608 F.2d 973, 981 (4th Cir.1979); *Rizika v. Merrill Lynch*, Civil No. M–80–1418, 1981 WL 1619 (D.Md. Jan.28, 1981), (citing the Fourth Circuit's *Miller* case *with approval*.) According to plaintiffs, McDonald's had exclusive and superior knowledge of matters referred to in the predictive statements at issue and since McDonald's should have been aware that Payne would rely heavily on its assertions, the statements in question are actionable.

 In the Fourth Circuit's *Miller* opinion, the Court noted that the questions of "superior knowledge" and of "reasonable reliance" are intertwined. *Miller*, 608 F.2d at 981. Whether reliance on future projections of profit is reasonable depends both upon the manner in which the projections are represented and what in fact was known by the person claiming inferior knowledge. Here, plaintiff Payne had extensive knowledge concerning the cost of constructing franchised McDonald's restaurants and the profits which might be expected to accrue from the operation of such restaurants, as well as an understanding of the impact which new restaurants in the area might have on his Broadway facility. Not only had Payne operated the Broadway restaurant itself for almost twenty years before 1994, but he had also operated restaurants at his other three Baltimore locations over a period of many years. Moreover, in 1976 and 1978, he operated for several years two additional McDonald's restaurants, one on Eutaw Street and the other on Liberty Road. Both in 1988 and later in 1990, Payne had objected to the opening of new facilities in the vicinity of his Broadway restaurant. Expressing his firm disagreement with the predictions made by McDonald's that the new restaurants would have minimal impact on sales at the Broadway facilities, Payne had his own decided views on the matter. Under such circumstances, it can hardly be claimed that Payne relied to his detriment on McDonald's predictions.

 With respect to allegations in a fraud case pertaining to statements of future profitability, various courts have explained that it is unreasonable to rely on projections of future profits. *See, e.g., Hardee's v. Hardee's Food Sys., Inc.*, 31 F.3d 573, 576 (7th Cir.1994); *cf. Fairchild Indus.*, 97 Md.App. at 343, 629 A.2d 1293 (holding that predictions about "future workload" are essentially speculative matters). On the record here, this Court is satisfied that McDonald's projections concerning the future building costs of the Broadway restaurant and concerning the impact of new restaurants on future sales of the Broadway facility are just as much predictions of "future events" as are projections of future profits. Accordingly, this Court concludes that it was unreasonable for plaintiff Payne to rely on any of McDonald's predictive statements as a basis for the assertion of fraud-based claims in this case. Indeed, Payne decided to rebuild his Broadway restaurant not because he relied on McDonald's cost estimates or other predictions but because McDonald's had conditioned renewal of the franchise on Payne's agreement to rebuild.

For these reasons, this Court concludes that plaintiffs have as a matter of law failed to state an actionable claim in any one of Counts III through VI inclusive.[17]

---

**17.** Inasmuch as the Court has determined that the alleged misrepresentations relied upon by the plaintiffs are not actionable as fraud, it is not necessary to consider whether plaintiffs' fraud-based claims are barred by limitations. Nor is it necessary for the Court to consider whether plaintiffs' allegations of fraud meet the requirements of Rule 9(b), F.R.Civ. P.

## IV

### *Conclusion*

For all the reasons stated, the motion to dismiss of defendant McDonald's will be granted as to all counts of the complaint. An appropriate Order will be entered by the Court.