629 A.2d 1293

**Sandra L. MILLER, et al.**

v.

**FAIRCHILD INDUSTRIES, INC., et al.**

**No. 1429, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

Sept. 1, 1993.

Certiorari Denied Dec. 8, 1993.

**326**

R. Martin Palmer, Jr., argued (Irvine H. Rutledge, on the brief), Hagerstown, Thomas J. Kaster, argued (Melvin M. Belli, Sr., Steven A. Fabbro, and Belli, Belli, Brown, Monzione, Fabbro & Zakaria, on the brief), San Francisco, CA, and (James E. Parrot, Richard E. Schwartz and Richard Schwartz & Associates, Ltd., on the brief), St. Louis, MO, for appellants.

Martin S. Himeles, Jr., argued (Donald J. McCartney and Zuckerman, Spaeder, Goldstein, Taylor & Better, on the brief), Baltimore, for appellees.

Argued before BLOOM, FISCHER and MOTZ, JJ.

BLOOM, Judge.

The dispute that resulted in this appeal, after seven years of spirited litigation, began with an announcement by appellee Fairchild Industries, Inc. (Fairchild), in August 1983, that it intended to close its main plant in Hagerstown, Maryland, thereby putting about 2,800 employees out of work. Three of those employees began the litigation by filing in the Circuit Court for Washington County a complaint against Fairchild and its chief executive officer, appellee Edward G. Uhl, asserting claims for fraud, intentional misrepresentation, and negligent misrepresentation. The complaint was amended to add a claim for abusive discharge; two new parties were substituted for two of the original plaintiffs, continuing the action with the three plaintiffs who are the appellants herein; appellants' motion for class certification was denied; and the court ruled

that limitations prevented appellants from amending to add 272 more plaintiffs.

Ultimately, all claims were disposed of in favor of appellees, either by dismissal or summary judgment, and this appeal followed.

## Facts

We shall briefly summarize the pertinent facts as gleaned from the pleadings below. At its plant in Hagerstown, Maryland, Fairchild manufactured aircraft, principally the Air Force A–10, and aircraft parts, including sections of the Boeing 757. In 1981, Uhl allegedly advised employees that Fairchild had transferred certain aircraft production work from the Hagerstown plant to another plant where workers "had better attitudes," allegedly referring to some Hagerstown employees' vocal opposition to Fairchild's dumping of toxic wastes in and around its plant.

On 2 September 1982, a Washington County Grand Jury indicted Fairchild on 86 counts of dumping, discharging, and abandoning liquid pollutants in excess of permitted effluent limitations in violation of §§ 8–1413 and 8–1416(b) of the Natural Resources Article of the Maryland Code. Appellants contend that the investigation by the Maryland Attorney General's Office leading to that indictment was initiated and fueled by information supplied by cooperating members of the affected class of former employees of the Hagerstown plant. Appellants have never identified the specific employees who cooperated with the state in its investigation, however.

In March of 1983, Uhl allegedly suggested to a member of the Hagerstown Chamber of Commerce in a private meeting that the Hagerstown plant would be closed and all employees discharged if the Attorney General followed through with his threatened prosecution of Fairchild for toxic waste dumping. Shortly thereafter, in April of 1983, a Washington County jury convicted Fairchild on five felony counts, and the company was fined $100,000.

In a bulletin distributed by hand at the plant on 29 August 1983, less than four months after Fairchild's conviction, the company announced the closing of its main plant in Hagerstown and the attendant discharge of its employees.

## Procedural History

The preceding events led three former employees of appellee Fairchild Industries to file a complaint against the company and Uhl on 28 August 1986 purportedly on behalf of themselves and numerous other former employees of the Hagerstown plant.[1] Their complaint alleged that Uhl and Fairchild had made false representations to employees regarding their job security and had fraudulently failed to inform employees in advance of the company's decision to close its Hagerstown plant. The employees also claimed that appellees had *negligently* misrepresented the employees' job security.

Appellants premised their fraud and misrepresentation claims on various public and private statements made by Uhl and other Fairchild representatives prior to the plant closing. First, in February of 1983, the *Herald Mail,* a Hagerstown newspaper, reported that Uhl predicted a rosy and positive future for the Hagerstown plant, which he said would be busy with work on a contract to manufacture Boeing 757's (the "757 contract") through the year 2000.

Next, in July of 1983, Uhl allegedly made a speech in which he urged Hagerstown employees to disregard rumors of a plant closing and assured them that the Hagerstown plant would remain in operation for another forty years.[2] Appellants assert that Uhl also indicated that there was no reason for employees not to proceed with plans to make major

---

1. Sandra Miller, Samuel I. Reid, and Charles J. Baish originally filed this action. Of these three original plaintiffs, only Miller remains. Reid and Baish withdrew as plaintiffs and were replaced by Samuel Beitler and David J. Keiser.

2. Witnesses do not agree on the exact date of the speech, but we will assume, for summary judgment purposes, that it occurred at the latest date asserted by appellants, July of 1983.

purchases and/or to take vacations. This speech, referred to as the "tarmac speech," was allegedly made at a compulsory assembly held on company time on an airstrip at the plant.

Finally, in August of 1983, Fairchild mailed the August issue of its internal monthly publication, *Fairchild World,* to all employees. The newsletter reported that "deliveries of subassemblies for the Boeing 747 and 757 were about even with last year's totals both in the second quarter and six months." *World* noted that production of Air Force A–10's was scheduled to cease in early 1984 unless additional orders or sales were received, but that production of spare parts would be "ongoing." A rise in Fairchild stock was also reported.

The complaint alleged that Fairchild's upbeat predictions about the company's future belied the fact that officials were at least contemplating closing the Hagerstown plant at the time the statements were made. Appellants supported this claim by citing various statements allegedly made by company officials. For instance, sometime in early 1983, prior to Fairchild's conviction, Uhl allegedly told members of the Hagerstown Chamber of Commerce that the future of the Hagerstown plant was uncertain and that if the Maryland Attorney General continued "to give Fairchild a hard time," he would move the company out of state. Shortly thereafter, Uhl allegedly threatened to close the plant and fire the employees if the Attorney General actually prosecuted the company. On 28 April, a Hagerstown newspaper announced Fairchild's conviction and reported that the trial court publicly censured the company for making (in the wake of its conviction) inappropriate threats to move the corporate headquarters out of state. Moreover, interrogatory answers submitted by Uhl indicate that as early as May of 1983 he first became aware that the 757 contract might be in jeopardy and might be turned back to Boeing, but did not warn employees.

Fairchild put forward evidence indicating that negotiations with Boeing over the fate of the 757 contract were proceeding satisfactorily as late as 4 August 1983. It was not until 12

August 1983 that Fairchild asked Boeing to relieve the company of its obligations under the 757 contract and that Fairchild officials first began to question the viability of the Hagerstown plant. On 16 August 1983 the company circulated a bulletin to employees in which it announced impending layoffs at the plant. Finally, Fairchild contends that the company did not actually decide to close the plant until 25 August 1983.

Fairchild and Uhl caused the action to be removed to federal court, where they moved to dismiss the suit on the ground that § 301 of the Labor Management Relations Act ("LMRA") preempted the employees' state law claims. During the pendency of appellees' motion to dismiss, the employees moved to amend their complaint to state a cause of action for retaliatory discharge. The new count alleged that defendants closed the plant in retaliation for employee cooperation with state and federal authorities in their prosecution and criminal conviction of Fairchild for toxic waste dumping.

On 5 August 1987, Judge Young of the United States District Court for the District of Maryland granted the employees' request for leave to amend their complaint, reasoning that the abusive discharge claim "related back" to the original complaint. Moreover, the court concluded that § 301 of the LMRA did not bar the state law claims. The case was then remanded to the Circuit Court for Washington County.

Once back in the circuit court, the employees moved for class certification pursuant to Maryland Rule 2–231 on 17 March 1988. On 1 June 1988 the court entered an order dismissing and/or staying the abusive discharge claims pending final resolution in federal court. The court based its ruling on the failure of the employees to state a claim for abusive discharge and on the court's conclusion that § 301 of the LMRA preempted the state law claim. Reasoning that Judge Young's prior decision in the case was not final as to any issue except dismissal of an unrelated count, the court denied defendants' motion to dismiss the fraud and misrepresentation claims.

On 20 July 1988, the court granted the employees' motion to substitute named plaintiffs, and two new employees were designated as representative plaintiffs of the proposed class of affected former employees. Several days later the court, *sua sponte,* ordered bifurcation of the trial. The first stage of trial was limited to the issues of the defendants' liability and the plaintiffs' entitlement to punitive damages.

On 17 January 1989, the court granted the defendants' motion to dismiss the retaliatory discharge claim for failure to state a claim, but also granted leave to the plaintiffs to plead it more specifically. The following month, on 17 February 1989, the employees filed their second amended complaint with a revised fourth count (the retaliatory discharge count). The revised count alleged that Fairchild and Uhl had closed the plant for the purposes of (1) retaliating against employees who "blew the whistle" on illegal toxic dumping at the plant and (2) "thwarting and punishing" Washington County and the State of Maryland for the Attorney General's vigorous enforcement of environmental laws. The employees alleged that the defendants' conduct violated specific mandates of public policy as expressed in the free speech guarantees of the state and federal constitutions and in the state and federal environmental protection laws,[3] specifically those under which Fairchild was indicted and convicted. By written order dated 18 April 1989, the court again dismissed the retaliatory discharge claim (count four) on the grounds that it was preempted by § 301 of the LMRA and that it failed to state a claim upon which relief could be granted under Maryland law.

After conducting a hearing on the employees' motion for class certification, the court denied the motion.

On 9 February 1990, the employees filed a third amended complaint, which adopted verbatim the substantive allegations

---

**3.** Maryland Natural Resources Code, § 8–1413, § 8–1413(p)(1), § 8–1413.2(p)(1), § 8–1416(b); The Refuse Act of 1899, 33 U.S.C.S. § 406–13; The Water Pollution Control Act of 1977, 33 U.S.C.S. § 1311–1319, 1342; The Superfund Act of 1980, 42 U.S.C.S. § 9601–13; and 18 U.S.C.S. § 4 (misprision of felony).

of the previous complaints, but also sought to add 272 specifically identified individuals to the class of plaintiffs. Appellants moved in the alternative to certify the class. On 29 March 1990, the court dismissed the third amended complaint on statute of limitations grounds and denied the class certification motion. The employees then filed a premature notice of appeal to this court, which was eventually dismissed.

On 19 December 1991, defendants filed a motion for summary judgment on the three individual plaintiffs' claims for fraud and intentional and negligent misrepresentation. The court granted that motion on 14 February 1992, whereupon appellants timely filed the instant appeal.

### Issues

Appellants present six issues for our review:

(1) whether § 301 of the Federal Labor Management Relations Act preempts appellants' abusive discharge claim;

(2) whether appellants' abusive discharge claim failed to state a cause of action under Maryland law;

(3) whether appellants' third amended complaint related back to the original complaint;

(4) whether appellants' attempt to add 272 plaintiffs in a third amended complaint was barred by the statute of limitations notwithstanding Maryland's common law "savings statute";

(5) whether the trial court erred in denying appellants' motions for class certification; and

(6) whether the trial court erred in granting appellees' motion for summary judgment on the claims of fraud, intentional misrepresentation and negligent misrepresentation.

A careful review of the record below leads us to the ineluctable conclusion that the trial court properly dismissed the abusive discharge claim for failure to state a claim and properly granted summary judgment in favor of appellees with regard to the fraud, negligent misrepresentation, and intentional misrepresentation claims. Our disposition of these

issues renders moot all of the other issues presented by appellants.[4] Accordingly, our analysis will focus exclusively on appellants' abusive discharge and misrepresentation claims.

## I. Abusive Discharge

The task before this Court is to determine whether the allegations of appellants' complaint, taken as true, together with all reasonable inferences to be drawn therefrom, state a cause of action for abusive discharge.[5] In the seminal case of *Adler v. American Standard Corp.*, Maryland joined a host of other states in recognizing this tort, referred to alternatively as retaliatory or abusive discharge. 291 Md. 31, 47, 432 A.2d 464 (1981). Maryland case law in this area is still quite sparse, but it is clear that a cause of action for abusive discharge will lie only where the employer's motivation in discharging the employee contravenes some clear mandate of public policy. *Id.*

In the instant action, the specific mandates of public policy allegedly violated are those expressed in the free speech guarantees of both the federal and state constitutions and in the federal and state environmental statutes. According to appellants, the conduct giving rise to the cause of action was Fairchild's closing of its Hagerstown plant and the resultant "discharge" of several hundred employees. Appellants reason that this closing violated public policy because it was effectuated for the specific purpose of retaliating against all plant employees for the "whistle-blowing" of several unnamed employees and also for the specific purpose of retaliating against

---

4. We also need not decide the preemption issue because, as appellees concede in their brief, the Maryland Court of Appeals recently settled the preemption debate. In *Finch v. Holladay–Tyler Printing, Inc.*, 322 Md. 197, 586 A.2d 1275 (1991), an opinion rendered after the lower court ruled in the case *sub judice*, the Court made it pellucidly clear that § 301 of the LMRA does not preempt abusive discharge claims of the nature alleged here. *Id.*

5. We will assume, for the purpose of the ensuing discussion, that a plant closing is in fact a "discharge" within the meaning of the tort of abusive discharge. Because we decide this case on other grounds, we decline to rule on the issue.

Washington County and the State of Maryland for perceived rigorous enforcement of environmental regulations.

Although creative, appellants' attempt to premise their abusive discharge claim on the United States Constitution and the Maryland Constitution does not withstand scrutiny. Constitutional guarantees have been uniformly interpreted to restrain and restrict only the conduct of the *government vis-a-vis* private individuals; in the absence of state action there can be no violation of constitutional rights. As appellants concede, Fairchild is not a government actor and it did not act in concert with the government. It therefore cannot seriously be argued that Fairchild actually violated the constitution in closing the plant. *Cf., Watson v. Peoples Security Life Ins. Co.*, 322 Md. 467, 477, 588 A.2d 760 (1991) ("We do not understand the trial court to have adopted the notion that constitutional rights of free speech and due process restricted the freedom of action of the private employer").

Appellants contend that the lack of state action and the absence of an actual constitutional violation are not fatal to their claim. They reason that, by retaliating against workers who elected to exercise their free speech rights by cooperating with environmental authorities, appellees so offended the *spirit* and *intent* of the free speech clauses that they can be fairly said to have violated the specific mandates of public policy expressed in those clauses. Appellants explain that this type of retaliatory action necessarily chills free speech and is anathema to the strong public policies expressed in constitutional guarantees.

There can be no question that a retaliatory plant closing of the nature and for the reason alleged here would have an alarming potential to chill free speech. We cannot, however, say that such closings constitute violations of public policy that would give rise to an abusive discharge claim. The task of defining public policy is best left to elected representatives of the people, and it is well settled that courts should undertake the task only with "the utmost circumspection." *Adler*, 291 Md. at 46, 432 A.2d 464, quoting *Patton v. United States*, 281

U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854 (1930). Constitutional prohibitions do not currently extend to private actors. This Court will not do what the framers of the state and federal constitutions themselves declined to do. We will not expand the reach of constitutional restraints.

Appellants rely on *Kessler v. Equity Management, Inc.*, 82 Md.App. 577, 572 A.2d 1144 (1990), asserting that, in allowing an employee to "sue her 'private' employer where the employee was fired for refusing to violate another citizen's constitutional rights," *Kessler* expanded the cause of action for abusive discharge. Appellants' reliance on *Kessler* is misplaced. There is, of course, a vast difference between firing someone for refusing to commit a trespass and invade a tenant's privacy (which happens to be a constitutionally protected interest) and firing an employee for exercising his or her constitutionally protected freedom of speech in such a way as to injure the employer. *Kessler* held that some conduct may be generally recognized in a civilized society as being so far beyond the pale, even if it has not been legislatively proscribed, that it would be against public policy to permit an employer to make performance of such conduct a condition of employment. That the conduct referred to in *Kessler* involved an invasion of a constitutionally protected right cannot be taken as meaning that discharge of an at-will employee for exercising his or her constitutionally protected right of freedom of speech to say things detrimental to the employer's interest would constitute an abusive discharge. The employee has a constitutional right to speak but not a constitutional right to remain an employee. In short, an at-will employee who has been fired cannot rely on *Kessler* as providing the basis of a suit for abusive discharge merely by asserting that he had a constitutional right to do the act that resulted in his being fired.

■ Appellants also premised their abusive discharge claim on the specific mandates of public policy embodied in state and federal environmental statutes. While the extensive scheme of environmental regulations is certainly compelling evidence

that legislators deem the eradication of pollution and the punishment of polluters to be critical public policy goals, recent Court of Appeals decisions preclude appellants' reliance on the laws to establish an abusive discharge cause of action. In *Makovi v. Sherwin–Williams Co.*, 316 Md. 603, 561 A.2d 179 (1989), and *Chappell v. Southern Maryland Hospital, Inc.*, 320 Md. 483, 578 A.2d 766 (1990), the Court severely restricted the scope of the abusive discharge tort.

*Makovi* held that the tort is "inherently limited to remedying only those discharges in violation of a clear mandate of public policy which otherwise would not be vindicated by a civil remedy." 316 Md. at 605, 561 A.2d 179. Where the public policy foundation for the abusive discharge claim is expressed in a statute, and that statute already contains a remedy for vindicating the public policy objectives, then judicial recognition of an abusive discharge claim is considered both redundant and inappropriate. *Id.*

In *Chappell* the Court further refined *Makovi* with respect to the availability and adequacy of statutory remedies. Because of the availability of remedies under various labor statutes, Chappell's abusive discharge claim was foreclosed under the *Makovi* rule. Chappell complained that none of the applicable labor statutes provided the breadth of damages that would have been available to him had he been permitted to pursue a tort action. 320 Md. at 497, 578 A.2d 766. He argued that it was unfair to deprive him of an abusive discharge cause of action when statutory remedies were deficient. The Court rejected Chappell's argument, holding that the statutorily created remedies were the exclusive remedies. "[T]o allow 'full tort damages to be claimed in the name of vindicating the statutory public policy goals upsets the balance between right and remedy struck by the Legislature in establishing the very policy relied upon.'" *Id.* at 497, quoting *Makovi*, 316 Md. at 626, 561 A.2d 179.

One of the environmental statutes upon which appellants seek to premise their abusive discharge claim contains a provision protecting employees from discharge or other retali-

ation for reporting their employers' environmental violations. Specifically, under the Superfund Act of 1980, 42 U.S.C. § 9610 (1988), aggrieved employees may file a complaint with the United States Secretary of Labor. If the Secretary concludes that a violation of the act occurred, he is empowered to grant relief which includes, but is not limited to, ordering rehiring or reinstatement of the employee with compensation or ordering the violator to take other affirmative steps to abate the violation.

As is evident from § 9610, legislators have already considered the problem of employer retaliation in the context of environmental violations, and have provided a mechanism whereby aggrieved employees may obtain compensation for losses incurred as a result of such retaliation. Consequently, the judiciary is not justified in recognizing an abusive discharge cause of action based on the environmental laws. *Makovi* and *Chappell* compel dismissal of appellants' abusive discharge claim. The court below did not err in so holding.

## II. Misrepresentation

Appellants urge this Court to hold that the trial court erred in granting summary judgment in favor of appellees on the fraud and negligent misrepresentation claims. In an oral opinion from the bench, the trial judge justified his decision to grant summary judgment in favor of Fairchild on the grounds that: (1) appellants put forth no evidence that the pertinent statements were false; (2) the statements were not representations of present or existing facts, but rather they were predictions or statements of expectation; and (3) appellants' reliance upon the statements was not reasonable.

Summary judgment motions are governed by Maryland Rule 2–501. Under Rule 2–501, trial courts are warranted in granting summary judgment in cases in which "there is no genuine dispute as to any material fact and ... the party in whose favor judgment is entered is entitled to judgment as a matter of law."

Our review of the propriety of the trial court's grant of summary judgment thus focuses on whether there was a dispute as to a material fact and, if not, whether the moving party was entitled to judgment as a matter of law. *Mayor & City of Baltimore v. Fidelity & Deposit Company of Maryland,* 282 Md. 431, 446, 386 A.2d 749 (1978). A material fact is one the resolution of which will somehow affect the outcome of the case. *Lynx, Inc. v. Ordnance Products, Inc.,* 273 Md. 1, 8, 327 A.2d 502 (1974). *Lawless v. Merrick,* 227 Md. 65, 70, 175 A.2d 27 (1961). In reviewing the record we must resolve all reasonable inferences against the moving party. *Russ v. Barnes,* 23 Md.App. 691, 698, 329 A.2d 767 (1974). General allegations, however, are not sufficient to forestall summary judgment. *Seaboard Surety Co. v. Richard F. Kline, Inc.,* 91 Md.App. 236, 243, 603 A.2d 1357 (1992). Rather, the necessary showing must be made "by facts[ ] which would be admissible in evidence." *Strickler Engineering Corp. v. Seminar, Inc.,* 210 Md. 93, 100, 122 A.2d 563 (1956).

In ruling on appellees' motion for summary judgment, the court below resolved all disputed questions of fact in favor of the employee plaintiffs. The precise statements adduced by appellants in support of their misrepresentation claims are as follows:

February 1983 The *Herald Mail,* a Hagerstown newspaper, reports that Fairchild CEO Uhl predicted a rosy and positive future for the Hagerstown plant, which he said would be busy working on the Boeing 757 contract through the year 2000.

July 1983 During his "tarmac" speech, Fairchild CEO Uhl advised Hagerstown plant employees to disregard rumors of a plant closing and assured them that Fairchild would be in Hagerstown for another forty years. Fairchild also suggested to the employees that there was no reason for them not to make major purchases and/or take vacations.

August 1983 The August 1983 issue of *Fairchild World* was mailed to all employees. In the newsletter Fairchild reported that "deliveries of subassemblies for the Boeing 747 and 757 were about even with last year's totals both

in the second quarter and six months." Fairchild also noted that production of A–10's was scheduled to end in early 1984 unless additional orders or sales were received, but that production of spares would be "ongoing." The newsletter reported that Fairchild stock had risen in value.

On the basis of our review of the relevant facts in the case *sub judice* in the light of Maryland tort law, we are convinced that the trial court did not err in granting appellees' motion for summary judgment. We explain.

## A.

A fraudulent misrepresentation or deceit claim is composed of five essential elements. To defeat a motion for summary judgment, the plaintiff must show:

(1) that the representation made [was] false;

(2) that its falsity was either known to the speaker, or the misrepresentation was made with such a reckless indifference to truth as to be equivalent to actual knowledge;

(3) that it was made for the purpose of defrauding the person claiming to be injured thereby;

(4) that such person not only relied upon the misrepresentation, but had a right to rely upon it in the full belief of its truth,[6] and that [s]he would not have done the thing from

---

6. It is well settled that a cause of action for misrepresentation (fraudulent or negligent) will not lie unless the plaintiff reasonably relied upon the representations. *Giant Food v. Ice King*, 74 Md.App. 183, 192, 536 A.2d 1182 (1988), *cert. denied*, 313 Md. 7, 542 A.2d 844 (1988). Judge Cardozo explained that in determining whether the critical element of reasonable reliance has been shown:

> We must view the act in its setting, which will include the implications and the promptings of usage and fair dealing. The casual response, made in mere friendliness or courtesy . . . may not stand on the same plane, when we come to consider who is to assume the risk of negligence or error, as the deliberate certificate, indisputably an "act in the law" . . . intended to sway conduct.

74 Md.App. at 192, 536 A.2d 1182, citing *Glanzer v. Shepard*, 233 N.Y. 236, 240–41, 135 N.E. 275 (1922). While we do not decide this case on

which the injury resulted had not such misrepresentation been made; and

(5) that [s]he actually suffered damage directly resulting from such fraudulent misrepresentation.

*Martens Chevrolet v. Seney,* 292 Md. 328, 333, 439 A.2d 534 (1982) (quoting *Gittings v. Von Dorn,* 136 Md. 10, 15–16, 109. A. 553 (1920)). *See also Finch v. Hughes Aircraft Co.,* 57 Md.App. 190, 231–32, 469 A.2d 867 (1984); *James v. Weisheit,* 279 Md. 41, 44, 367 A.2d 482 (1977). Proof of scienter is critical to a successful deceit action; nothing short of actual fraud will suffice. *Id.* at 334.

 As we have stated before, the general rule is that predictions or "statements which are merely promissory in nature and expressions as to what will happen in the future are not actionable as fraud." *Finch,* 57 Md.App. at 232, 469 A.2d 867. *See also Travel Committee v. Pan American World Airways, Inc.,* 91 Md.App. 123, 179, 603 A.2d 1301, *cert. denied,* 327 Md. 525, 610 A.2d 797 (1992). The reasons for this rule have been explained as follows:

> Representations as to what will be performed or will take place in the future are regarded as predictions and hence are not fraudulent, irrespective whether the matter is before the court as an action for damages for deceit or defensively as a ground of avoidance of a written contract.... A false assertion presupposes that an event has occurred, that a duty has been performed, that a fact has intervened or that an authority exists, either or all of which may have induced the contract or prevented its being consummated. (To anticipate the future and predicate falsehood upon an act to be done or omitted at a future day would change a mere broken promise into a fraud on the part of him who was bound to fulfill the engagement, thus practically illustrating the old forms of declarations in assumpsit, wherein the

reliance grounds, we will note that the reasonableness of appellants's reliance, "viewed in its setting," is questionable at best.

defendant was always charged with fraudulently and deceitfully refusing to perform his agreement.)

9 S.M. Speiser, C.F. Krause, & A.W. Gans, *The American Law of Torts* § 32:27 (1992).

■ If such promissory or predictive statements are made with the present intention not to perform, however, courts will not apply the general rule against deceit actions based on misrepresentations concerning future acts. *Travel Committee*, 91 Md.App. at 179, 603 A.2d 1301; *Finch*, 57 Md.App. at 232, 469 A.2d 867. *Accord Selby v. Quartrol Corp.*, 514 So.2d 1294, 1297 (Ala.1987).

■ In the case *sub judice*, many of appellees' statements were promissory or predictive in nature. Uhl and other officials predicted that there would be enough work to keep the plant operating, and assured employees that Fairchild expected to continue its Hagerstown operation well into the future. The longevity of the plant and its future workload were essentially speculative matters. The comments would be actionable only if, at the time they were made, the speakers knew that the plant would be closed or that there would not be enough work to keep it afloat. Appellants utterly failed to produce any evidence that Fairchild believed that its future in Hagerstown was dim at the time the statements were made. Instead, appellants support their position by pointing out that contract negotiations between the company and Boeing became increasingly frail and culminated in the loss of a major contract. The record is devoid of evidence indicating that Fairchild knew, prior to 12 August 1983 (which was long after any of the statements relied on by appellants), that the negotiations would culminate in the loss of the Boeing contract. The company explained that it anticipated that its disputes with Boeing over the contract ultimately would be resolved as they had in the past. No evidence was presented to rebut this explanation.

During his tarmac speech, Uhl is alleged to have made fraudulent misrepresentations to employees by squelching rumors of a plant closing and by assuring employees that they

could continue to make major purchases without fear of job loss. Once again, the statements concern the plant's future.

To maintain their action in the face of appellee's motion for summary judgment and affidavits asserting under oath that Fairchild had no intention to close the Hagerstown plant until late August 1983, appellants were required to put forth some contradictory evidence indicating that Fairchild's decision to close the plant predated the tarmac speech. No such evidence was presented, with the possible exception of Uhl's off-the-cuff remarks to Chamber of Commerce members at the time of the Attorney General's investigation and prosecution of Fairchild. That comment may have been a display of anger or pique, or it may have been a threat to the local economy calculated to force a retreat by the Attorney General. From appellants' standpoint, it could conceivably have indicated Uhl's then present intent, which would not necessarily be indicative of his intent at the time of his tarmac speech, after the prosecution had been concluded. If, on the other hand, such a "threat" may be inferred to have been an expression of a fixed and unalterable resolve to shut the plant down if the prosecution continued, appellants' case might be strengthened in one respect but destroyed in another—if it were reasonable to infer from such comments the existence of a present and unyielding state of mind, it would be unreasonable to have placed any reliance on the assurances in the tarmac speech several months later.

The representations made in the August issue of *Fairchild World* are clearly not actionable. The newsletter reported that the company's stock had risen in value and that deliveries of subassemblies were about even with deliveries made the previous year. While these were both clear representations of existing fact, appellants make no claim that the statements were false. Rather, they argue that they were mislead to the extent that the statements suggested the plant's future was secure and promising. Appellants cannot, however, hold the company liable for erroneous inferences they themselves drew from true and accurate statements.

When a company announces its past accomplishments, it certainly does not undertake to *guarantee* future success. To hold otherwise would likely transform annual reports and advertisements into sources of endless litigation.

Finally, there can be no recovery based on the statements in *Fairchild World* that "production of A–10's was scheduled to end in early 1984 unless additional orders or sales were received," and that "production of spare parts would be 'ongoing.'" Appellants contend that, although the comments were accurate, they "furthered the illusion" that the plant's future was bright and are actionable for that reason. Even if one is to construe the comments as positive indicators of the plant's future, a construction that we think is questionable, they were not false and thus not actionable. In sum, we find that appellants failed to make the necessary showing to defeat appellees' motion for summary judgment on the fraudulent misrepresentation claims.

## B.

Even where *deliberate* falsehood is lacking or cannot be proven, however, a plaintiff may still state a cause of action for negligent misrepresentation. Appellants attempted to do so. One whose "conduct in uttering the statement was culpably careless," but not intentionally fraudulent, may be guilty of the tort of negligent misrepresentation. *Giant Food* 74 Md.App. at 186, 536 A.2d 1182. An action for negligent misrepresentation will only lie where the following five criteria are met:

(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;

(2) the defendant intends that his[/her] statement will be acted upon by the plaintiff;

(3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;

(4) the plaintiff, justifiably, takes action in reliance on the statement; and

(5) the plaintiff suffers damage proximately caused by the defendant's negligence.

*Weisman v. Connors,* 312 Md. 428, 444, 540 A.2d 783 (1988) (quoting *Martens Chevrolet v. Seney,* 292 Md. 328, 337, 439 A.2d 534 (1982)).

The statements made in the August issue of *Fairchild World* fail to satisfy the first prong of the negligent misrepresentation standard; they simply were not false. Consequently, appellants cannot rely on the statements to avoid summary judgment.

The remaining statements adduced by appellants in support of their negligent misrepresentation claims are the same predictive or promissory statements cited in support of the fraud/deceit/intentional misrepresentation claim. A negligent misrepresentation claim based on statements promissory or predictive in nature, however, suffers the same fate as a deceit claim based on such statements. Unless the plaintiff puts forward evidence tending to show that the "promisor" or "predictor" made the statements with the present intention not to perform, the claim is not viable. But any promise that is made with the present intention not to perform or any prediction that is made with present knowledge that the predicted event will not occur is, perforce, an intentional misrepresentation, not a negligent one, and thus cannot sustain an action for negligent misrepresentation. The trial court did not err in granting summary judgment in favor of appellees on both the fraud and the negligent misrepresentation claims.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANTS.