**CROFTON VENTURES LIMITED PARTNERSHIP, Plaintiff,**

v.

**G & H PARTNERSHIP, et al., Defendants.**

**No. Civ.A. MJG–96–1378.**

United States District Court, D. Maryland.

March 22, 2000.

---

Steven K. Fedder, Carolina E. Petro, Rudnick, Wolfe, Epstein & Zeidman, Washington, DC, John Chen, Kathleen L. Nooney, Piper, Marbury, Rudnick & Wolfe PH, Chicago, IL, for Plaintiff.

Geoffrey R. Garinther, Venable, Baetjer & Howard, Towson, MD, Thomas Mark Lingan, Venable, Baetjer & Howard, Baltimore, MD, Thomas M. Downs, Milissa Ann Murray, Laura A. Ford, Swidler Berlin Shereff Friedman, LLP, Washington, DC, for Defendants.

## MEMORANDUM OF DECISION

GARBIS, District Judge.

This case was tried before the Court without a jury. The Court has heard the evidence, reviewed the exhibits, considered the materials submitted by the parties and had the benefit of the arguments of counsel. The Court now issues this Memorandum of Decision as its findings of fact and conclusions of law in compliance with Rule

52(a) of the Federal Rules of Civil Procedure.

## I. BACKGROUND

### A. The Property at Issue

The case involves a fifty-five acre (more or less) tract of land located on Patuxent Road in Anne Arundel County, Maryland (referred to, in its entirety, as "the Tract."). For purposes of this discussion, the Tract is considered to be divided into two segments, referred to herein as "the Site" (some 32 acres) and "the Adjacent Site" (some 23 acres, southeast of the Site).

Starting some time prior to the 1930's, sand and gravel surface mining, as well as other operations took place on various portions of the Tract. From about 1930 through about 1977 three Alan E. Barton enterprises operated on the Site:

- Alan E. Barton Hot Mix Asphalt (until about 1967)
- Alan E. Barton Sand and Gravel (until about 1977)
- Alan E. Barton Ready–Mix Concrete (until about 1977).

In late 1976, Bituminous Construction Company ("BCC") acquired the Tract from James P. Barton and Irene B. Mitchell.[1] In 1977, E. Stewart Mitchell, Inc. ("ESM") merged with BCC. ESM, as the surviving entity, obtained ownership of the Tract.

Starting in 1977, there was an asphalt production operation on the Adjacent Site portion of the Tract. ESM operated the asphalt facility from 1977 to 1981. In 1981, ESM leased the Adjacent Site (including the asphalt facility) to Bituminous Construction, Inc. ("BCI"), a part of a business organization controlled by Harry Ratrie ("Ratrie")

In 1981, BCI took over the ESM asphalt manufacturing facility continuing operations in a similar fashion.[2] In 1985, the Ratrie organization, through G & H Partnership,[3] exercised an option to purchase the Tract. After the Ratrie organization (G & H) acquired the Tract, BCI continued its asphalt operations on the Adjacent Site. The Site portion of the Tract was not significantly used by BCI; although some repairs were done in a garage building during the off season.[4] The principal use of the Site, which occupied less than a majority of the Site, was by a tenant, Michael Jones, who ran a sand and gravel business there.

In 1987, Mr. P. Joseph Horisk ("Horisk") was interested in acquiring the Site portion of the Tract for use in the vehicle salvage pool business.[5] In April of 1987, C & H Properties (a Cox[6]–Horisk partnership) entered into an Agreement (including an Addendum) with G & H Partnership to purchase the Site portion of the Tract for $600,000. The purchase was "subject to an engineering study to determine that the property contains no hazardous materials of any kind whatsoever." Agreement, ¶ 13. The Addendum called for the Buyer to use its best efforts to obtain an engineering study to determine the absence of a "hazardous waste or substance" within 120 days. The Buyer was given the right to enter on the Site at any time, to make a physical inspection and conduct various tests. The Addendum further contained the representation that

---

1. Persons connected with the Barton operation.

2. As pertinent to the instant case, BCI more or less immediately obtained equipment allowing it to recycle waste asphalt and, later, obtained certain equipment for testing that greatly reduced the use of the toxic chemical at issue in this case.

3. The general partners were Harry and Dahlia Ratrie.

4. The cold weather period during which asphalt road construction was dormant.

5. Essentially, through arrangements with insurers, "totaled" vehicles are taken to the salvage pool. Horisk's company does paperwork, auctions off the vehicles and arranges for prompt removal.

6. Cox, not involved in the instant lawsuit, has a business relationship with Horisk.

to the best of Seller's knowledge, and while the [Site] was in Seller's possession, the [Site] has not been used for hazardous waste disposal, and no party has transported, caused to be transported, stored or caused to be stored on the [Site] [any hazardous waste].

There was a series of amendments to the Agreement having the effect of extending the closing date through 1991 and, among other things, reducing the purchase price to $500,000.

By 1991, Horisk had obtained an engineering study certifying to him the absence of hazardous materials on the Site. On or about February 21, 1991, C & H Partnership assigned its interests to Plaintiff Crofton Ventures Limited Partnership ("Crofton") [7]. Crofton closed the transaction on the Site on or about February 27, 1991. Crofton then proceeded with plans to develop the Site for use in the vehicle salvage pool business.

By the summer of 1991, Anne Arundel County (the "County") was planning to acquire part of the Site for some road improvement. The County, after a field review, stated that Crofton had to obtain a certificate from the Maryland Department of the Environment ("MDE") that the portion to be deeded to the County was "clean." Some three and half years later, the certification process was undertaken.

In February of 1995, Crofton's environmental consultant conducted an initial walk-through of the Site. The consultant observed an area in which there were several dozen fully or partially exposed rusted fifty-five gallon drums and what appeared to be other drums buried. In April of 1995, Crofton's environmental consultant took liquid samples from five of the exposed drums, analyzed the samples and found trichloroethylene ("TCE") in four of the drums. TCE is the contaminant at issue in this case. In July of 1995, Crofton removed all of the drums (totaling some 285 fifty-five gallon drums) and other debris from the Site.

### B. Potential Sources of The Contaminant at Issue

As noted above, there were asphalt manufacturing facilities on the Tract, including Alan E. Barton Hot Mix Asphalt on the Site from prior to 1930 to 1967, BCC (ESM) on the Adjacent Site from 1977 to 1981 and BCI (Ratrie) on the Adjacent Site starting in 1981. By virtue of the nature of the asphalt production and testing process, each of these operations generated toxic waste, including TCE.

As pertinent to the instant case, it is appropriate to provide a simplified summary of the process for making road asphalt (sometimes referred to as "bituminous cement").

Essentially, a petroleum product [8] referred to as "bitumen" or "liquid asphalt" is heated to some 300 degrees and combined with a mixture of sand, stones and gravel. The size of the stones used is a critical factor in the type of asphalt produced, affecting the smoothness and durability of the road surface. The liquid asphalt serves as a binding material which holds the product together. The finished asphalt, in the form of "hot mix asphalt," is transported in a heated container to the road site where, still hot, it is spread upon the road bed.

As pertinent to this case, asphalt is often tested at the production facility prior to acceptance by the customer. In particular, governmental entities buying asphalt for roads would have the testing done at the production location before the hot asphalt was transported to road side. Testing was done by having a small sample of the finished asphalt, described as being the size of two hockey pucks, combined with a quantity, said to be approximately two to three pints, of TCE, a commercial solvent. The TCE dissolves the finished hot mix asphalt product into its ingredients, con-

---

7. Crofton is a Maryland limited partnership; the general partners are Crofton–Horisk, Inc. and Crofton–Cox, Inc.

8. A fraction of crude oil.

sisting of sand, stones and gravel and a residual liquid consisting of liquid asphalt dissolved in TCE. Until new technology (installed by BCI in 1985 or 1986) effectively eliminated the TCE waste,[9] the test residue liquid was placed in a fifty-five gallon drum for disposal. Accordingly, the Barton, ESM and BCI asphalt production operations were possible sources of the TCE found on the Site.

Moreover, there are other possible sources, because TCE is utilized in a variety of industrial contexts.[10] Therefore, there could well be numerous facilities having nothing to do with asphalt and located off the Tract that were the source, or a source, of the TCE found on the Site.

Plaintiff Crofton seeks recovery from the Defendants on the following grounds:

1. The Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.* ("CERCLA").

2. Fraudulent Misrepresentation by G & H in the Addendum to the Agreement of Sale.

3. Breach of Contract by G & H.

To establish the CERCLA claims, Plaintiff must prove that ESM and/or BCI placed TCE on the Site. The misrepresentation and contract claims pertain to the state of knowledge of Ratrie and/or G & H with respect to the presence of contaminants on the Site.

## II. *THE CERCLA CLAIM*

### A. *Statutory Framework*

Section 107(a) of CERCLA[11] provides, in pertinent part, that:

Notwithstanding any other provision or rule of law, and subject only to [certain defenses not pertinent to the instant case]—

(1) the owner ... of ... a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who ... arranged for disposal ... of hazardous substances at any facility ... owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who ... accepted any hazardous substances for transport to ... sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

\*\*\*

(B) any ... necessary costs of response incurred by any other person consistent with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release....

For reasons set forth in the Memorandum and Order issued January 31, 1997, the Court held that Crofton, even though itself a potentially responsible person as site owner (CERCLA § 107(a)(1)), had standing to bring a cost recovery action under § 107(a).[12]

9. New technology allowed for the distillation of the liquid residue so that substantially all of the TCE was recycled and the need for disposal of "used" TCE became *de minimis.*

10. TCE is a chlorinated commercial solvent commonly used to degrease machinery and remove paint. When Mr. Vining, Plaintiff's agent, reported the toxic waste fluid to the Maryland Department of Environment, he stated that "he suspected TCE was used as a solvent for parts cleaning operations." Plaintiff's Exh. 22, Report of Observation.

11. 42 USC § 9601 *et seq.* It is customary to refer to 42 USC § 9601 as Section 101 of CERCLA, § 9602 as Section 102 of CERCLA etc. All statutory references herein are to CERCLA unless otherwise specified.

12. Defendants had contended that, as a potentially responsible person, G & H could not sue under § 107 but was able only to bring an action for contribution under § 113.

To establish a claim under § 107, a plaintiff must prove that:

(1) the site at issue (or a portion thereof) is a facility within the meaning of the statute,

(2) that a release or threatened release of a hazardous substance has occurred,

(3) that the release (or threat) has caused the Plaintiff to incur response costs consistent with the National Contingency Plan, and

(4) that the defendant is a covered person.

*United States v. Fairchild Indus., Inc.,* 766 F.Supp. 405, 409 (D.Md.1991).

In the instant case, it is established that the Site (or at least a portion thereof) is a "facility" because it is a "site or area where a hazardous substance (TCE) has been ... placed." § 101(9)(B). It is further established that a release and/or threatened release of a hazardous substance has occurred. § 101(22).

It is undisputed that the release and/or threat caused Crofton to incur response costs; however, the Defendants dispute that the costs were incurred consistent with the National Contingency Plan.

Crofton contends that each Defendant is a covered person under § 107(a) on the following theories:

1. G & H was an owner and operator of the Site at the time TCE was released and disposed of on the site. § 107(a)(1)–(2). The general partners of G & H (Mr. & Mrs. Ratrie) are also liable.

2. BCI arranged for disposal of TCE on the Site. § 107(a)(3). Harry Ratrie, as an officer of BCI, is also liable.

3. ESM and BCI/G & H were owners and operators of the Site at the time TCE was released and disposed of thereon. § 107(a)(2).

Each Defendant denies that it/he/she is a covered person under § 107(a).

### B. *Discussion*

#### 1. *In General*

As noted above, Plaintiff seeks to hold the Defendants liable under § 107(a). Plaintiff contends that, during the years 1977 [13] through approximately 1988,[14] the operators of the asphalt production plant on the Adjacent Site dumped TCE on the Site. If the dumping took place as alleged by Plaintiff, the Defendants would be responsible persons under § 107(a) because:

1. ESM would be an owner and active dumper at the time of dumping from 1977 to 1981.

2. ESM would be an owner at the time of dumping from 1981 to 1985.

3. G & H would be an owner [15] at the time of dumping [16] starting in 1985.

Essentially, the case turns on whether the Plaintiff can prove if, and when, the operators of the asphalt plant on the Adjacent Site (ESM and BCI collectively referred to as the "Bituminous Producers") dumped TCE on the Site. If Plaintiff could so prove, ESM would be a responsible person from 1981 to 1985 and G & H would be a responsible person starting in 1985.

As pertinent to the central question, whether Plaintiff has proven the alleged dumping in the post 1976 period, it is established that the following occurred:

1. In February of 1995, consultants working for Crofton (and/or a related entity) discovered a dump area on the Site.

---

**13.** The time or commencement of asphalt production on the Adjacent Site.

**14.** Since, as discussed herein, the Court concludes that Plaintiff has failed to prove that there was any TCE dumping on the Site after 1977, issues as to when such dumping would have ceased are moot.

**15.** It is not necessary to determine whether G & H could be held liable as an operator since, as discussed herein, Plaintiff has not proven that BCI placed any toxic waste on the Site.

**16.** The dumping in this time period would have been done by BCI, a Ratrie organization entity that was not sued in this case.

2. At the time of discovery, the dump area contained several fifty-five gallon drums that were visible.

3. The contents of five of the drums were tested and four were found to contain at least some TCE.

4. In May of 1995, Crofton reported discovery of TCE on the Site to the Maryland Department of Environment.

5. In July of 1995, Crofton, through a contractor, performed a clean up operation in which all of the drums on the Site were extracted from the ground, over packed in 110 gallon drums for safety, removed and disposed of.

6. The dump site debris included:

   a. Some 285 fifty-five gallon drums, some of which contained TCE.

   b. A significant number of tires (described as truck tires).

   c. Some "white goods" described as junked household appliances such as refrigerators.

   d. Miscellaneous industrial debris.

   e. Some road signs.

   f. Three truck mud flaps, two bore the name "E.S. Mitchell Asphalt" and one bore the name "Barton Concrete."

Accordingly, it is established that one or more persons, at various times prior to 1995, placed TCE on the Site. The question before the Court is whether the Plaintiff has proven that some, if not all,[17] of the drums containing TCE were placed on the Site by the Bituminous Producers from 1977 on.

Plaintiff has presented no direct evidence of dumping by the Bituminous Producers, the alleged perpetrators. Of course, direct evidence is not essential and, indeed, might be rarely available in a CERCLA case. Any post 1976 dumping would have been illegal and would most

likely have been carried out surreptitiously. Plaintiff contends that it has presented circumstantial evidence from which the Court can, and should, find that the Bituminous Producers placed TCE on the Site at the time in issue.

As discussed below, the Court concludes that the Plaintiff has not presented circumstantial evidence of sufficient reliability to permit and/or to warrant a finding that Plaintiff has carried its burden of proof. Plaintiff has, at most, presented evidence to raise a mere suspicion that the Bituminous Producers (or one of them) *might* be responsible for placing some drums containing TCE at *some* improper location. Plaintiff has not proven by a preponderance of the evidence that the Bituminous Producers, ESM and/or BCI, placed any TCE on the Site.[18]

2. *"Lost" Evidence*

■ A considerable amount of potentially probative evidence, under the control of the Plaintiff, has become unavailable. The Court does not find that the Plaintiff deliberately engaged in any spoliation; however, had Plaintiff's agents taken reasonable care, significant evidence would have been preserved.

The presence of several dozen weathered fifty-five gallon drums on the Site, hence the existence of a potential pollution problem, was discovered by the Plaintiff in February of 1995. By March of 1995, test results revealed that four of five drums tested contained TCE, a hazardous substance. Hence, at that point the pollution problem was no longer potential, but definite. Then, if not before, Plaintiff knew, or should have known, that it was going to be necessary to preserve any evidence available to establish the identity of the persons who had placed the drums containing TCE (and any other toxic waste

---

17. Plaintiff contends that it has established, or at least wishes the Court to find, that *all* of the drums (and hence all of the toxic waste) was placed on the Site by the Bituminous Producers after 1976.

18. The evidence presents a basis to *suspect* that the Bituminous Producers *may have* disposed of their toxic waste in an irregular manner at *some* location, but not necessarily on the Site.

that may have been discovered) on the Site.

Unfortunately, Plaintiff's agents did not preserve, and in some instances destroyed or abandoned, evidence that likely would have been significant in determining the source of the drums at issue.

### a. The Location of the Dump Site

A threshold problem with Plaintiff's circumstantial case the is absence of reliable proof of the location and size of the dump site at which the drums at issue were found.

Plaintiff presented a witness who was purportedly expert in analyzing aerial photographs. The expert witness drew free hand ovals which he said located the dump site on 1968, 1977 and 1984 aerial photographs of the Site. Based upon the testimony of the expert witness as to the location of the dump site, Plaintiff's counsel spun a theory which, if accepted, could tend to establish a chronology favorable to the Plaintiff. That is, the dump site area would have been surrounded by heavy woods in 1968 and 1977 so that there was no way to get a truck into the area, and then, by 1984 the dump site would be on, or include, an unvegetated area readily accessible by vehicles. Presumably, then, one could infer that the drum dumping took place after 1977.

Unfortunately, the Plaintiff's aerial photograph analyst made a critical error in his testimony. That is, he placed the dump site at a position on the 1984 photograph substantially different from the location at which he placed it on the 1968 and 1977 photographs. Accordingly, Plaintiff's counsel's argument based upon the alleged progressive changes in the dump site totally lacked an evidentiary foundation.

Furthermore, due to the inconsistency in the expert's placement of the dump site on the respective aerial photographs, there is no valid basis for the Court to choose which of the two spots at which the expert placed his ovals reflects the expert's opinion of the location of the dump site.[19] Furthermore, even if the Court could conclude which of the two different locations represents the expert's opinion, the Court does not find the expert's testimony to be sufficiently reliable to accept as the basis for finding the precise location and size of the dump site.

If, as suggested by Plaintiff's counsel, the Court should accept the location placed on the 1984 photograph as reflecting the expert's opinion, the Court does not accept its accuracy. The 1984 photograph location is on a portion of the Site that was then being used by a tenant for a sand operation. It is unlikely that the Bituminous Producers would be illegally dumping toxic waste at a location on which a tenant was contemporaneously carrying on a sand operation. It is also unlikely that neither the tenant, nor any of the other persons who came to the area on which the tenant was operating (including State personnel), would have failed to notice the presence of several dozen weathered fifty-five gallon drums and other indications of possible pollution.

If, as is somewhat more likely in the Court's view, the location of the dump site was as placed on the 1968 and 1977 aerial photographs, there would be a chronological sequence less favorable to the Plaintiff. On this hypothesis, the dump site area would, as of 1964, have been an area which plainly showed prior use as a site for surface mining with a drag line. The aerial photograph reflects a characteristic indication of prior drag line mining in that there are rather straight line rows of vegetation sharply defined by denuded areas on which the drag line mining had taken place. The 1977 aerial photograph shows the area somewhat changed in that the vegetation lines are less sharp (although

---

19. In the course of argument Plaintiff's counsel added, by hand, ink drawn circles of where *counsel* argued that the location would have been on the 1964 and 1977 photographs to be consistent with the 1984 photograph marking by the expert. Counsel's markings are themselves inconsistent with the expert's markings on the 1984 photograph and, in any event, do not constitute evidence of any kind.

some of the change might be due to the fuzziness of the photograph) and there appears to have been some growth in the denuded area. In the 1984 photograph, the denuded strips appear to be substantially regrown. If the markings on the 1968 and 1977 photographs reflect the expert's opinion as to the location of the dump site, and this same location is placed on the 1984 aerial photograph, one would conclude that (1) the site area had been the subject of drag line mining which ceased some years prior to 1968 [20] and (2) the area then commenced to regrow and was, by 1984, virtually completely regrown. On this hypothesis, it would be more likely that drum dumping took place prior to 1977, while the dump site area was denuded from strip mining, rather than later, close to 1984, after the vegetation had regrown.

There is in evidence a video tape of clean up operations at the dump site. Plaintiff's agent, narrating the video, fails to preserve readily available evidence of the location and size of the dump site. The video tape contains a statement by the narrator that the "clean area" outside the location of the drums is located several paces, north by forty degrees, from the office trailer on the site. A mud flap is said to have been found 105 paces from the trailer (possibly in a northerly direction). This locational information is, regretfully, not accompanied by information as to the location of the trailer. The narrator's location information amounts to the equivalent of a hapless fisherman marking a good spot for catching bass by placing an "X" on the side of the boat.

The bottom line is that the Plaintiff's agents did not preserve evidence of the location or of the size of the dump site. Yet, in the context of the instant case, the location and size of the dump site would be significant.

### b. Evidence on the Dump Site

The record reflects significant and/or potentially significant evidence on the dump site that was lost in the clean up process.

Possibly the most significant evidence on the dump site consisted of the fifty-five gallon drums themselves. These were in various stages of degradation. Certainly, it would be helpful if some of the drums had been examined by an appropriate expert to see what could be discerned regarding the timing of the degradation—at least to see if one could tell whether the drums had been on the site for more or for less than the 18 years from 1977 to 1995.

Moreover, it is obvious from the photographic evidence that there were two starkly different types of drums. Some (at least seven or so of these are visible on the photographs in evidence) have sides fully corrugated as distinct from the majority which have just two corrugations. The evidence establishes that the fully corrugated drums were in use in the 1930's and early 1940's. The presence of these drums indicates that the dumping (at least of these drums) took place a long, long time ago.[21] It appears reasonable that a comparison of the degradation of the fully corrugated drums with the degradation of the "newer" type could have been useful in seeking to establish whether the "newer" drums were dumped after 1977.

A substantial number of tires—sometimes referred to as truck tires—was found on the dump site area (wherever it might have been). Plaintiff's agents failed to preserve evidence as to the precise characteristics of the tires. For example, it would have been simple, yet potentially significant, to have preserved evidence of, for example, the type of tires and indications of the vintage of the tires.

Without belaboring the point,[22] it suffices to close this discussion by reference

---

**20.** The strips that were largely denuded in 1968 had been virtually completely regrown by 1984, 16 years later.

**21.** In the Penniman & Browne (Plaintiff's consultants) report of May, 1995, there is a picture of a fully corrugated drum with the

caption "Corrugated Drum indicative of extremely advanced age." Pl. 7.

**22.** For example, by discussing the less than precise evidence of the contents of the drums, the absence of evidence of any potentially

to the failure of the Plaintiff's agents to preserve reliable evidence of the relationship between significant objects found on the dump site. For example, Plaintiff seeks to make much of the fact that three mud flaps, two of which are of a type used on ESM Asphalt trucks during and after the 1960's, were found on the dump site. Plaintiff's counsel sweepingly asserts that based on this evidence, Plaintiff has proven that the TCE containing drums had been dumped on the Site after 1976. Regretfully, the Plaintiff did not present, because its agents did not preserve, evidence of the relationship between the as-found locations of the mud flaps and any drums or other significant objects.

Of course, the Court does not suggest that Plaintiff's agents should have treated the dump site with the scientific precision of an archeological dig at a Pharaoh's tomb. However, the mud flap evidence may have been meaningful (one way or the other) had there been a photograph, contemporaneous sketch or other reliable evidence showing where and how the mud flaps were found, how much above and how much below the surface, how close to any buried drums, whether below or above any drums, etc. The mud flap evidence that was presented, absent reliable evidence to permit evaluation of its significance, was little, if any, more than ambiguous.

Let there be no misunderstanding, the Court is not drawing inferences against Plaintiff for spoliation of evidence. *Compare Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir.1995). Rather, this Court is noting the absence of apparently material evidence as significant in concluding that Plaintiff has failed to prove its claims against the Defendants by a preponderance of the evidence.

### 3. *Suspicion Regarding ESM and BCI*

There is cause for suspicion regarding the propriety of the Bituminous Producers' actions. The Defendants have presented no evidence regarding the proper disposal of their hazardous waste, including TCE. It may be true that the Bituminous Producers had no legal obligation to retain records of their TCE disposal.[23] On the other hand, it is certainly a suspicious circumstance that Defendants could produce no witness who could recall, with any specificity, the manner of disposal of TCE waste.

Plaintiff seeks to rely upon the testimony of George Randall, a former employee of the Bituminous Producers, who says that he came on the premises shortly after the BCI (Ratrie) acquisition and saw some thirty-one fifty-five gallon drums of waste near the testing facility, smelled TCE and told BCI employees that these had to be disposed of in a proper way. He was told not to worry about it. Within a week, the drums were gone.

Mr. Randall was deceased at the time of trial so that his deposition was used as his testimony. Although the Court did not observe Mr. Randall, it concludes that his testimony is not reliable. He most certainly had a reason to be hostile to Ratrie in view of the fact that he had stolen from the Ratrie organization, was caught and forfeited his pension. Further, his story is unlikely on its face. The purported build-up of thirty-one drums of waste is itself unlikely if, as Plaintiff claims, BCI was dumping such waste on the nearby, convenient Site. Moreover, the characteristic smell of TCE would have been apparent to anyone in the area of the drums, that is the testing facility. Yet, that was an area regularly frequented by government inspectors who would have noticed the smell and were unlikely to have overlooked the build-up of a substantial amount of appar-

---

helpful characteristics of road signs, the absence of useful information regarding the "white goods" found etc.

**23.** Defendants contend that ESM and BCI were "Small Quantity Operators" and, thereby, exempt from certain hazardous waste disposal requirements.

ently toxic waste. Finally, even taken at face value, Randall's testimony does no more than support a suspicion that BCI was not disposing of its waste properly.

The question before this Court is whether the Court can find, by a preponderance of the evidence, that the Bituminous Producers dumped their TCE waste on the Site. The fact, if it were a fact, that the Bituminous Producers did not dispose of their TCE waste properly would not necessarily establish that the improper disposal was on the Site rather than at some other location. Indeed, if there were improper TCE disposal by the Bituminous Producers, the evidence does not make it more likely that the disposal would have been on the Site rather than at a different location. After all, at the pertinent times, each of the Bituminous Producers had a direct interest in the Site and would have had an incentive to avoid polluting property that they owned or contemplated owning.

In any event, the Court does not find that the suspicion engendered by Defendants' lack of affirmative proof of proper disposal, taken together with the other evidence and the absence of evidence, warrants a finding that Plaintiff has carried its burden of proof.[24]

## III. *FRAUDULENT/INTENTIONAL MISREPRESENTATION*

In Section 12(f) of the Addendum to the Agreement of Sale G & H, as seller, represented:

> to the best of Seller's knowledge and while the [Site] was in Seller's possession, the [Site] has not been used for hazardous waste disposal, and no party has transported, caused to be transported, stored or caused to be stored on the [Site] [any hazardous waste].

Plaintiff seeks to recover on the theory that the foregoing was a fraudulent misrepresentation.

**24.** It is not necessary to discuss the Defendants' contention that Crofton's response was inconsistent with the National Contingency Plan.

■ To establish an intentional misrepresentation claim, Plaintiff must prove that:

1. The representation made was false;
2. Its falsity was either known to the speaker, or the misrepresentation was made with such a reckless indifference to truth as to be equivalent to actual knowledge;
3. It was made for the purpose of defrauding the person claiming to be injured thereby;
4. Such person not only relied upon the misrepresentation, but also had a right to rely upon it ...; and that
5. He actually suffered damage directly resulting from such fraudulent misrepresentation.

*Miller v. Fairchild Industries, Inc.*, 97 Md.App. 324, 629 A.2d 1293, 1302 (1993).

■ In the instant case, the first two elements are melded inasmuch as the representation is that Seller does not know that the Site was used to store hazardous waste or that hazardous waste had been transported there. Be that as it may, there is no doubt that hazardous waste was present on the property (the TCE in some of the drums) at the time of the representation. Accordingly, the question presented as to the first two elements boils down to whether Plaintiff has proven[25] that the representation of the absence of hazardous material was known to be false by the G & H partnership or made with reckless indifference to truth.

The evidence does not permit even a plausible argument that G & H (Harry Ratrie) had actual knowledge of the presence of hazardous materials on the property at the time of the representation. There is no affirmative evidence of such knowledge. To the contrary, the objective evidence establishes beyond any doubt that Ratrie had no such knowledge.

**25.** The burden of proof imposed for the tort of intentional misrepresentation is proof by clear and convincing evidence. *See Gross v. Sussex,* 332 Md. 247, 630 A.2d 1156, 1161 (1993).

G & H acquired the Tract in August of 1985, a time at which there was, in fact, hazardous waste thereon. In structuring the acquisition, Ratrie (through control of his enterprises) assigned the option to purchase from BCI, a corporation, to G & H Partnership, a partnership of which he was a general partner. Accordingly, had he then known of the hazardous waste, he would have deliberately chosen to expose himself and his wife (as G & H general partners) to personal liability for the clean-up expense, to potential litigation from persons claimed to have been injured and to whatever damages might be established by such claimants. It is inconceivable that Ratrie would have made the acquisition, taking on the burden of ownership of a polluted site, had he then known of the pollution.

Furthermore, there is nothing to indicate that G & H (Ratrie) learned of the existence of hazardous waste on the Tract between its August of 1985 acquisition and the April of 1987 agreement of sale to Crofton, or by the 1991 closing for that matter. Once again, the objective evidence refutes any inference of such knowledge. Ratrie would have been most unwise to sell the Tract had he known of the existence of hazardous waste. He would certainly have exposed himself to litigation from the purchaser and potential liability for the clean up and damages. Moreover, if Ratrie had been aware of the hazardous waste, he would have acted senselessly to sell it. He would have lost control of the Site and, hence, lost any ability to keep the existence of hazardous waste hidden.

Indeed, Ratrie's actions demonstrate his innocence. Ratrie (G & H) entered into a contract for sale that gave the buyer permission to inspect the entire Site, conduct tests etc. with the ability of the purchaser to rescind the deal if hazardous waste were found. Yet, in fact,[26] there were indicia of hazardous waste (two dozen or so heavily weathered fifty-five gallon drums) visible to whomever chose to go to the dump area

(wherever that may have been). Once the purchaser became aware of the drums, it was inevitable that there would be an examination of the contents and the sale would have been voided. Ratrie then would have to make appropriate disclosure to various agencies, bear expenses, risk damages and, quite possibly face a claim for contract damages from the Buyer.

In sum, the Court concludes, beyond doubt, that G & H (Ratrie) had no actual knowledge of the existence of hazardous waste on the property at the time of the representation.

Plaintiff has not proven that G & H or Ratrie acted with reckless disregard to the truth of the representation at issue. As noted above, in this case, Ratrie "put his money where his mouth was" when he bought the Tract and, in regard to the sale of the Site, acted with obvious good faith. Horisk, with every right and incentive to make a thorough examination of the property, did not find indicia of contamination. Even assuming that Horisk's agents were negligent, there is no evidence that Ratrie did anything to hinder them. Nor does the Court find that Ratrie failed to do anything he reasonably should have done prior to making the representation at issue.

Finally, the Court notes Plaintiffs' argument that if BCI (a Ratrie entity) was responsible for placing the TCE on the property, the corporate knowledge of BCI could be imputed to the G & H partnership. There may be merit to this argument. After all, the evidence—albeit not extensive—indicates that BCI and G & H were commonly controlled and seemed to be, in effect, part of a single coordinated business organization. Nevertheless, Plaintiff has not proven that BCI was responsible for placing the TCE on the premises. Accordingly, Plaintiff has not proven the requisite knowledge on the part of any BCI employee or agent. Therefore,

26. Unfortunately, it appears that Plaintiff's agents did not trouble themselves to perform an adequate examination before advising Horisk that the Site was clean.

there is no corporate knowledge to impute to the Defendant partnership.

## IV. *BREACH OF CONTRACT*

As discussed above, in Section 12(f) of the Addendum to the Agreement of Sale, G & H represented that, to the best of its knowledge, the Site had not been used for hazardous waste disposal. Plaintiff contends that this statement constituted a warranty that was breached. The breach of contract claim is subject to the same analysis and disposition as the fraudulent misrepresentation claim.[27] The Plaintiff has not proven by a preponderance of the evidence that G & H knew, or should have known, of the hazardous waste on the Site.

## V. *CONCLUSION*

For the foregoing reasons:

1. The Court finds that Plaintiff has not established its claims against Defendants.

2. Judgment shall be entered dismissing all claims with prejudice without costs.[28]

---

27. The fact that the preponderance burden of proof standard, rather than the clear and convincing standard, applies to the breach of contract claim does not change the result.

28. The decision to refrain from awarding costs to Defendants is deliberately made. Un-der the circumstances of this case, including the absolute certainty that Horisk had nothing to do with the placement of TCE on the Site, the Court concludes that costs should not be awarded.